## STANDARD OIL CO. OF NEW YORK v. UNITED STATES.

District Court, S. D. New York. May 2, 1928.

1. **Shipping ⬤132(4)—Shipowner has burden of showing seaworthiness or due diligence to make seaworthy to avail of Harter Act (46 USCA §§ 190–195).**

That shipowner may avail of the Harter Act (46 USCA §§ 190–193; Comp. St. §§ 8029–8033, 8035), as defense to sue for damage to cargo, he has the burden of proving seaworthiness of vessel or due diligence to make her so.

2. **Shipping ⬤121(1)—Obligation to make vessel seaworthy is not delegable.**

Shipowner cannot delegate to repair man the obligation to make vessel seaworthy.

3. **Shipping ⬤121(1)—Diligence as to the ship's seaworthiness and not merely as to certificate is the requirement.**

The requirement of shipowner that compliance may be available as defense is diligence as to the vessel's seaworthiness, and not merely in getting a seaworthy certificate.

4. **Shipping ⬤121(1)—Diligence required is to have vessel seaworthy at beginning of voyage.**

The diligence as to seaworthiness required of shipowner, to be available as defense to claim for cargo damage, is to have vessel seaworthy at beginning of voyage.

5. **Shipping ⬤137—Bill of lading cannot relieve shipowner of duty of diligence for seaworthiness under Harter Act (46 USCA §§ 190–195).**

Stipulation in bill of lading cannot relieve shipowner of initial duty under the Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035), to use due diligence to furnish seaworthy vessel.

6. **Shipping ⬤132(4)—Vessel's utter unseaworthiness when barely out of port raises presumption of unseaworthiness when sailing.**

That vessel was utterly unseaworthy when barely out of port raises a presumption of unseaworthiness at the time of sailing.

7. **Shipping ⬤132(4)—Shipowner held not to have sustained burden of proof of due diligence to make vessel seaworthy by proper cleaning of lubricating system.**

Shipowner, in suit for damage to cargo through undue prolongation of voyage, *held* not to have sustained burden of proof of due diligence to make vessel seaworthy by proper cleaning of lubricating system.

In Admiralty. Suit by the Standard Oil Company of New York against the United States, owner of the steamship Cohasset. Decree for libelant.

Bigham, Englar & Jones, of New York City (T. Catesby Jones and Ezra G. Benedict Fox, of New York City, of counsel), for libelant.

Charles H. Tuttle, U. S. Atty., of New York City (Horace M. Gray, Sp. Asst. U. S. Atty., of New York City, of counsel), for the United States.

WINSLOW, District Judge. This is a suit for cargo damage, brought by the owner of cargo loaded on the steamship Cohasset at New York, after having been transshipped to the Cohasset from the steamship West Calumb, which had been damaged by collision in the East River within a few minutes after leaving her dock. A number of other cases of cargo damage are stipulated to be tried upon the same evidence.

The defense is based on the third section of the Harter Act (46 USCA § 192; Comp. St. § 8031):

"If the owner of any vessel * * * shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel. * * *"

The cargo involved in the case was an original shipment, for which clean bills of lading were issued. A large proportion of the shipments were conceded to be of cargo transferred from the West Calumb after her collision in the East River.

On October 5, 1922, the Cohasset was in lay-up, where she stayed for not quite two months. On or about November 27, 1922, she was shifted to Newport News shipyard, to be dry-docked before undergoing repairs. She had been towed to the repair yard from the lay-up, and here specifications were prepared after a survey. From Newport News she was taken to the repair yard of the Southern Shipbuilding Company. The specifica-

tions, among other things, called for a thorough cleaning of the lubricating system. After the repairs were made in dry dock, she proceeded to New York. On January 27, 1923, having loaded her cargo, she left her pier in Brooklyn, anchoring off the Statue of Liberty late on that day. The following morning, January 28th, she proceeded to sea. The engine room log shows that, as soon as the ship put to sea, the engineers found it necessary to clean the strainers of the lubricating system every half hour, and had to run the De Lavel separators almost constantly. This was kept up throughout the voyage. Under ordinary conditions competent witnesses said that strainers are used only once or twice a day. On January 30th, two days after clearing, the steering gear jammed three times. On February 1st, the vessel stopped, and was "not under control." The engine room log states that they were then "taking about 20 pounds of soft mud a day out of the lubricating system." On February 2d, the Cohasset stopped four times for engine room repairs. Conditions were such that the safety of the vessel prompted an attempt to turn back and make for Bermuda as a port of refuge. The captain testifies, however, that they were unable to make any headway toward Bermuda, "owing to the condition of the engines and the water." The attempt to make Bermuda was abandoned on February 3d, and a wireless call for assistance was sent out. On February 4th, the Cohasset floundered along at slow speed, and, on February 5th, was finally taken in tow by another vessel and towed to Ponta del Gada, where she arrived on February 17th. The entry of the deck log of February 7th notes, "Engines disabled entirely." While being towed, the engines ran irregularly. At Ponta del Gada another survey was had and repairs were made after a full month's stay. On March 16th and 17th, the Cohasset went outside the harbor for a sea trial. The trial trip developed various kinds of engine trouble, and it was evident that even then much of the dirt in the system had not been eliminated. Nevertheless the ship attempted to continue its voyage to its Mediterranean destination. On March 19th and 20th, frequent stops were made for engine room repairs. On March 24th, the engine room condition was apparently hopeless, and the Cohasset was again taken in tow by still another vessel and brought into Gibraltar on March 25th, nearly two months after leaving New York. At Gibraltar, the Cohasset was again surveyed. This survey disclosed

such deplorable conditions that it was found necessary to discharge her cargo and transfer it once more into another Shipping Board boat, the West Gotomska. Ultimately the cargo was delivered at the specific ports of destination in the Far East, some of the goods arriving at destination in July, upwards of six months after shipment from New York.

The ill-fated Cohasset was finally towed back from Gibraltar to New York, and returned to the lay-up fleet. During this period of upwards of four months, she had been able to proceed less than two weeks under her own power, and, according to the testimony of her second assistant engineer, the man in the engine room, had "only nine days of peace and quiet."

The undue prolongation of the voyage produced deterioration and cargo damage —sweat damage to bags of flour, particularly when the ventilation was poorest,—for illustration, when stationary and detained at Ponta del Gada for a month.

Two questions arise:

(1) Was the vessel seaworthy when she left New York?

(2) Had the owner exercised due diligence to make her seaworthy?

[1] In order for the shipowner to avail himself of the Harter Act as a defense, the burden is on him to prove that he has exercised due diligence. The Wildcroft, 201 U. S. 378, at page 386, 26 S. Ct. 467 (50 L. Ed. 794).

[2] It is quite evident that the shipowner cannot delegate to a repair man his obligation to make the vessel seaworthy. Bethlehem Shipbuilding Corp. v. Joseph Gutradt Co. (C. C. A.) 10 F.(2d) 769.

[3, 4] Diligence in respect to the vessel itself, and not diligence in getting a seaworthy certificate, is the requirement. In the case at bar, the condition of the ship at the repair yard, at a point distant from New York, while relevant, is by no means conclusive. The condition of the ship at New York, the port of departure, where the cargo was loaded, is of vital importance. If the shipowner is to be released from liability, he must exercise due diligence to see that the vessel is seaworthy at the time of beginning the voyage. The Wildcroft, supra. The log is a most eloquent witness that the vessel was shockingly unseaworthy. The most casual reading of this amazing record would convince the most skeptical. The inquiry to which the court more particularly directs attention is the question as to whether or not due diligence before sailing had been ex-

ercised by the shipowner to discover and remedy the defects which made the voyage so disastrous.

[5] The stipulation in the bill of lading cannot relieve the shipowner from the discharge of his initial duty under the Harter Act (46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035) to use due diligence to furnish a seaworthy vessel. And, even if the damage result through fault or error in management, the exception of the Harter Act cannot be availed of unless (a) the vessel was seaworthy when she sailed, or (b) due diligence to make her so had been exercised. The burden is on the shipowner to establish the existence of one or the other of these conditions. International Nav. Co. v. Farr & B. Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830. This burden has not been sustained in this case.

[6, 7] The right of the shipowner to be exonerated in the respects named in the Harter Act depends upon the exercise of due diligence upon his part in discharging the primary duty of providing a seaworthy vessel. The weight of the testimony in the instant case is to the contrary. The utter unseaworthiness of the vessel when scarcely out of port raises a presumption of unseaworthiness at the time of sailing. Martin v. The Southwark, 191 U. S. 1, 24 S. Ct. 1, 48 L. Ed. 65.

When only two days out, the steering gear jammed on three separate occasions, and the vessel was helpless. At Ponta del Gada, "the steering engine gearing was in bad condition." This presumably had been fixed before leaving Newport News, but it was not inspected by competent persons at New York. One source of trouble to the Cohasset was grit and rust and salt water in the lubricating system. The oil and water mulsified, and, acting as an abrasive on the metal surfaces of the engine, created still more grit.

Eliminating from the mass of testimony speculative and hearsay matters, there are some facts that stand out with distinctness. The specifications for repairs which were made at the Southern Shipbuilding Company, consisting of upwards of 102 items, contain, among other things, provisions for cleaning out the lubricating oil system, etc. The record shows that the method used to clean this lubricating system consisted of removing sediment from the lubricating oil tanks and wiping them with kerosene soaked rags and finally flushing the system by pumping oil through the pipes.

I am satisfied, from the convincing testimony of witnesses, that this method was wholly insufficient to properly clean the lubricating system, in view of the nonuse of the machinery for a long period of time. The pipes were not hammered to dislodge the flakes of rust. This hammering was the common practice, according to the testimony of a witness, who impressed the court with his frankness and thorough knowledge of the necessities of this case.

After the repairs were made, to which reference is made, a dock trial was had. The court is satisfied, however, that such dock trial does not give the same straining in working as a vessel experiences at sea. The condition of this vessel undoubtedly was such that a much more rigid inspection and rehabilitation was necessary if she were to make a sea voyage. Even under the dock trial and the favorable conditions appertaining thereto, a certain amount of dirt was found in the strainers. The rust and salt water produced a most serious condition, which finally disabled the machinery. We might look further and find other defects which proper diligence would have disclosed before sailing. These include leaky oil coolers and improper connections of the salt water surface and the forward bearing.

The respondent offers a theory, but no evidence whatever as to the cause of rust and grit and salt water in the lubricating system. The respondent speculates that some of its own officers must have rigged up a hose from a galvanized iron standpipe to a nipple on the main thrust bearing, and by that means introduced salt water into the oil-lubricating system. A witness testifies that salt water could have been so introduced. Not a single witness, however, has been produced to show any such rigging. As the court said at the trial, a person who would rig up such an arrangement would be either non compos or malicious. Presumably, if persons belonging to either classification had done the act, there were plenty of witnesses who might have been called to prove the fact, but none were called, although the court did hold the case open at the request of respondent, to take the deposition of Mr. Downey, the chief engineer, who presumably would have known all about it. His deposition was not taken in this case.

It is idle to speculate further when the record is convincing that the Cohasset must have been lamentably unseaworthy before sailing, and that inspection by a qualified person, with knowledge of her prior history and the exercise of due diligence, would have revealed defects of vital importance.

The burden resting upon the respondent of showing compliance with his primary duty, if he would avail himself of the Harter Act, has not been sustained.

. Decree for the libelant.