**J. C. PENNEY CO., Inc. v. THE AMERICAN EXP. CO., Inc. et al.**

**THE EXCHANGE.**

United States District Court
S. D. New York.
Dec. 10, 1951.

---

Atkins & Weymar, New York City (Horace T. Atkins, New York City, of counsel), for libelant.

Carter, Ledyard & Milburn, New York City (Edwin H. Krom, Heywood Shelley, New York City, of counsel), for respondent, The American Exp. Co.

Haight, Deming, Gardner, Poor & Havens, New York City (J. Ward O'Neill, M. E. De Orchis, New York City, of counsel), for respondent American Export Lines, Inc.

GODDARD, District Judge.

This is a suit in admiralty brought by J. C. Penney Company, Inc., against the American Express Company, Inc. [hereinafter called Express Company], American Export Lines, Inc. [hereinafter called

Export Lines], and the Steamship Exchange for damages to 14 cases of mixed rayon and cotton tapestry fabrics on a voyage from Genoa, Italy, to Boston and New York City.

Respondent Export Lines owned and operated the Exchange during the voyage in which we are interested.

Respondent Express Company owns all of the stock of an Italian corporation known as American Express Company, S. A. I., and is a wholly owned subsidiary of American Express Company, a New York unincorporated association. Each of these companies had something to do with the shipment here involved. For the purposes of the present action only, it has been stipulated that they are to be treated as though they were one.

Since 1940 the Express Company has acted for libelant in arranging abroad for the transportation, loading, and clearance through outgoing customs, etc., of shipments of goods bought abroad by libelant from foreign concerns.

Libelant purchased the cases of fabrics from Molteni & Figli, Nibionno, Italy, for importation to St. Louis under a contract of sale by which Molteni was required to deliver the goods to respondent Express Company or its correspondent forwarding agents, who were to act for libelant in dispatching the cases. They were part of a large purchase that was divided into four partial shipments. The shipment with which we are concerned was the second shipment.

After securing from respondent Express Company a quotation of the then current ocean freight rates applying to such shipments, libelant sent shipping directions to Molteni & Figli requesting shipment via the services of the Express Company.

On September 6, 1946, Molteni turned over to its forwarding agent, Vio & C. of Monza, Italy, its first partial shipment under the contract. This shipment is not the shipment involved in the present action. In accordance with arrangements previously made by American Express Company, Vio forwarded the goods to Vesin, who was respondent Express Company's port correspondent in Genoa. Vesin arranged the clearance of the shipment through outgoing customs and the loading of the shipment on board an Export Lines steamship, the Explorer. The Explorer issued a set of on-board bills of lading covering the shipment, which were turned over to Vio by Vesin. The bills of lading, Molteni's draft and other documents required by the letter of credit, which had been issued by the Chase Bank in New York, were presented to the Italian correspondent bank in Monza. The latter bank negotiated the draft and airmailed the draft and documents to the Chase Bank, which paid the draft and transmitted the documents to libelant prior to October 9, 1946, the date of arrival of the shipment. On October 14, 1946, libelant mailed the bills of lading to American Express Company in New York, requesting it to arrange the shipment of the goods In Bond from New York to St. Louis.

On September 20, 1946, American Express Company wrote to libelant and suggested that libelant have its letter of credit amended to stipulate that payment would be made against American Express Company through bill of lading, evidencing shipment of the merchandise from Italy to St. Louis via either New York or Boston. The reasons given for suggesting this change were that " * * * when a shipment is covered by an American Express Company through bill of lading, our Milan office consign the shipments on the ocean bill of lading direct to the American Express Company at U. S. Port of arrival and they send to us the original ocean bill of lading which enables us to make the In Bond entry and arranged the reforwarding to St. Louis upon arrival of the steamer, and delivery in St. Louis is made against surrender of the original through bill of lading issued by the American Express Company properly endorsed. * * *

"When there is an available sailing from Italian port to Boston, it is more advantageous to use this route as no cartage charges are incurred at Boston whereas such charges are incurred at New York."

Libelant made the suggested change and wrote the Express Company—"We trust

this arrangement will facilitate and expedite the handling of these shipments for our account."

On November 9, 1946, Molteni delivered to its forwarder, Vio, the second partial shipment [which is the one with which we are concerned]. Vio delivered the goods to Vesin, Express Company's correspondent in Genoa, who then booked space for the shipment on Export Lines' steamship Exchange, arranged for the loading of the goods on board, cleared the shipment through Italian port formalities, and procured the issuance of the Export Lines' on-board bill of lading. On November 16, 1946, the 14 cases of fabrics were received on board the Exchange at Genoa, and stowed in No. 1 'tween deck.

On November 19, 1946, American Express issued at Milan American Express bills of lading in duplicate and mailed them to Molteni. These bills were presented to the Italian Bank with Molteni's draft and were then forwarded to the Chase Bank in New York. After the draft had reached New York and had been presented and paid, but prior to the arrival of the Exchange in New York, the Chase Bank delivered the American Express bills of lading to libelant.

When the hatch was opened after the arrival of the Exchange on December 8, 1946 at New York, the cases of fabrics were found to have been damaged by sea water.

Libelant was the owner of the goods at all times material to this action. The shipment was in good order and condition when delivered to the Steamship Exchange at Genoa. The fourteen cases were stowed in No. 1 upper 'tweendeck, and the damage occurred on the voyage from Genoa as a result of sea water entering No. 1 hatch.

■ Since it has been proved that the goods were loaded in good condition and outturned damaged, the respondent carrier [Export Lines], in order to avoid liability, must prove (1) that the harm resulted from an "excepted cause" for which the carrier was not liable, or (2) that it exercised due diligence to avoid and prevent harm, 46 U.S.C.A. §§ 1303, 1304; General Foods

Corp. v. S. S. Troubador, D.C., 98 F.Supp. 207, 1951 A.M.C. 662, 664. Respondent Export Lines has failed to sustain this burden.

■ The respondent Export Lines contends that it is not liable for this damage because the damage was allegedly caused by a peril of the sea for which the respondent Export Lines is not liable in that unusually heavy seas encountered on the westward voyage caused the water to enter No. 1 hatch.

To avoid liability, the ship owner must have exercised due diligence to see that the vessel was seaworthy at Genoa where the cargo was loaded. Standard Oil Co. of New York v. United States (The Cohasset) D.C., 26 F.2d 385, 1928 A.M.C. 895. This was not done.

■ Prior to taking on this cargo at Genoa, the Exchange had carried cargo on a voyage from the United States to various Mediterranean ports. When the steel hatch covers of No. 1 hatch [a steel hatch] were opened at Beirut on October 19, 1946, it was found that water had entered the hold. The following two long entries were made on that day:

"When No. 1 steel hatch was opened, it was found that rubber gasket had split, fitting over hatch coamings, when hatch had been secured leaving an opening for water to enter into holds. Damage to cargo by water unknown at this time."

"Bales of second-hand clothing stowed in No. 1 lower 'tween deck under the hatch were found wet, to a small extent, caused by the leakage of water through faulty gasket on steel hatch. Also some paper boxes containing empty bottles were wet by the same cause. Contents bottles O.K."

On October 26th, the following entry was made: "45 bags of calcium carbonate stowed in lower' tween deck found wet, caused by leakage through faulty rubber gasket on top of steel hatch."

The gasket consisted of long strips of rubber cemented together and shaped so as to fit into a groove around the hatch cover. The gasket rested upon the top of the hatch coaming and was normally held in place by the weight of the hatch

cover and by the bolts or "dogs" on the side of the coaming.

Upon the opening of No. 1 hatch at Beirut, it was found that one end of the gasket at the starboard after corner of the aft section of the hatch had split, become loose, and hung down the side of the coaming for some six inches and that sea water had entered the hatch through the faulty gasket and damaged the cargo stowed in the hatch. Despite this, all that was done before starting on the westward voyage was to push with a stick the damaged gasket back into place when the hatch cover was lowered. It should have occurred to the master that, if the gasket had come loose on the eastward voyage, the movements of the ship probably would work it loose again, and water would be likely to enter the hatch on the westward voyage too. Moreover, after the hatch cover was lowered, the gasket was not inspected until the Exchange reached New York. It seems clear that reasonable care was not taken to make the vessel seaworthy.

Respondent Export Lines' second contention that the damage was caused by a peril of the sea is also without merit. Three of the officers of the vessel testified that it was discovered in New York that a hinge was cracked and that three of the thirty "dogs" on the forward port corner of the first section of No. 1 hatch were broken [there were three separate sections of No. 1 hatch cover]; also that there was a "belly" or dent in the center or second section of the hatch cover leaving an opening of about three-quarters of an inch to an inch between the gasket of the damaged hatch cover and the athwartship coaming on which the after edge of the hatch cover for this section rested.

Although no evidence other than the opinions of Export Lines' witnesses was offered to show when or how this alleged damage to the hatch cover occurred, it is the contention of respondent Export Lines that this damage occurred during unusually heavy seas, especially during a storm on December 3, 1946. Export Lines contends further that the water then entered the hatch at these two places and not where the defective gasket had previously been found at the after starboard corner of the third or aft section of the hatch cover.

It seems more probable that this damage did not occur during the storm but that the damage may have occurred later in the course of discharging cargo. Had this damage occurred during the storm, it would have been or should have been discovered before the vessel reached New York.

The condition of the hatch cover must have been apparent even to a casual observer. If the damage were caused by the storm, it is difficult to explain why it was not discovered until the ship reached New York—particularly in view of the testimony that the hatch was inspected regularly while the ship was at sea, and that the "dogs" were treated with penetrating oil when the ship left Boston [the storm had occurred before the vessel reached Boston] and why nothing was done after the storm to protect the cargo either by spreading a tarpaulin over the hatch or otherwise. If the seas were as rough as respondent contends, reasonable care called for an early inspection of the hatch, especially when it was known that the hatch had leaked on the eastward voyage. Neither the alleged broken hinge, "dogs" or gasket were produced in court.

Refuting Export Lines' contention that extraordinarily heavy seas caused extensive damage to the hatch cover and then to the cargo, is the fact that there was no structural damage to the vessel nor was any cargo other than that in No. 1 hatch damaged. There was no convincing evidence offered that the weather encountered was any worse than should have been expected at that time of the year in the North Atlantic.

The entries in the log do not support respondent's theory that the damage to the cargo resulted from the cracked hinge, broken "dogs", and dent in the hatch cover. No such damage to the hatch cover is mentioned in the log. On the contrary, a log entry made in New York on December 11, 1946, placed the blame for the water damage on the gasket. It reads as follows: "On opening No. 1 hatch, preparing to discharge, it was found that during

heavy weather from December 2 to December 4, considerable water had leaked in around hatch gasket and caused considerable damage to cargo underneath."

Respondent Export Lines has not sustained the burden of showing that the damage to the cargo resulted from an "excepted cause".

Libelant also seeks recovery for the damage to this cargo from respondent Express Company. The libelant's claim is based on two theories of liability; (1) that the Express Company assumed the liability of a carrier for this shipment, and (2) that the Express Company was negligent in not routing the shipment through Boston. Neither claim is well taken.

It is the contention of the libelant that since Express Company requested the libelant to modify its letter of credit so that Express Company could issue its own through bill of lading and route the shipment to St. Louis through either New York or Boston; that since libelant did so modify its letter of credit; that since the shipment itself was delivered to Express Company's correspondent at Genoa, who employed third parties to transport the shipment itself to alongside the Exchange and to load the shipment on board the vessel; that since the Express Company "grouped" the shipment with another shipment consigned to the Express Company at New York; that since Express Company routed the shipment through New York even though the vessel first stopped at Boston; that since the damage was caused by the unseaworthiness of the Exchange, Express Company assumed the liability of a common carrier and is liable to libelant for the full extent of the damages sustained by libelant.

■ However, I think that the Express Company was not a carrier but was merely a forwarding agent and, as such, liable only for its own negligence. The factors to be considered in deciding whether or not one assumes the liability of a carrier have been discussed in two recent opinions of the Supreme Court. Chicago, M. St. P. & P. R. Co. v. Acme Fast Freight, 1949, 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817; United States v. American Union Transport, Inc., 1946, 327 U.S. 437, 66 S.Ct. 644, 90 L.Ed. 772. When the facts of the case at bar are compared and the legal principles set forth in those cases considered, it seems clear that Express Company was acting as a forwarding agent and not as a carrier.

Express Company, as the agent of libelant, handled the details of the shipment, procured transportation by carrier, and paid all the charges of the carrier, etc. Libelant reimbursed Express Company for these expenditures and paid Express Company a fee for its services.

Libelant contends that since Express Company included two shipments [libelant's and one of another customer of Express Company] on the one bill of lading, that Express Company was the type of forwarder who assumed the liability of a carrier. This type of carrier is described by Mr. Chief Justice Vinson in Chicago, M., St. P. & P. R. Co. v. Acme Fast Freight, supra [336 U.S. 465, 69 S.Ct. 701], as follows: "* * * This forwarder picked up the less than carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination. The freight forwarder charged a rate covering the entire transportation and made its profit by consolidating the shipment with others in carload quantities to take advantage of the spread between carload and l.c.l. rates. It held itself out not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee. * * *".

■ That is not our case. Although Vesin, Express Company's correspondent, did accept from Export Lines a bill of lading which acknowledged receipt of two shipments, one of which was not Penney's, Express Company paid exactly the same freight for the Penney shipment that it would have paid had a separate bill of lading been issued for each shipment.

It is admitted that Express Company was merely the agent of libelant in handling the first shipment on the Explorer. The fact that the letter of credit was modified

to allow Express Company to issue its own bill of lading and to route the shipments through Boston as well as New York did not change Express Company's status. Although it had more authority and discretion on the second shipment than it had on the first, Express Company was still the agent of libelant on this latter shipment.

That this was the understanding of the parties is shown by the correspondence between them, especially in view of the fact that Express Company had functioned as libelant's agent for many shipments in the past.

In its letter notifying Express Company that it had had the letter of credit modified, libelant stated "We trust this arrangement will facilitate and expedite *the handling of these shipments for our account.*" [Emphasis Supplied.]

Express Company's bill of lading contained a provision on its face which described Express Company's undertaking as follows: *"to act as shipping agent* for the Shipper, and as such to make arrangements for the transportation of the property above described by service of railroad, ship, lighter, or any Carrier or medium of transportation * * * to be designated by the shipper or in default of such designation to be selected by the company *for and on behalf of the shipper,* owner, consignee or holder of this document." [Emphasis Supplied.]

It seems clear that Express Company held itself out merely to handle the details of the shipment and to arrange with common carriers for the transportation of the goods. It did not undertake to deliver the shipment safely at its destination. It did not assume any responsibility for the goods but was responsible merely for its own negligence.

█ Libelant also seeks recovery from Express Company on the ground that, even if it were a mere forwarder, Express Company was negligent in accepting from Export Lines a bill of lading calling for discharge of the shipment at New York instead of Boston. However, there was no showing that routing the shipment via New York rather than Boston had any causal connection with the loss suffered so that there can be no recovery on that ground either.

The libel against American Express Company must be dismissed.

The libelant may have a decree against respondents American Export Lines, Inc. and the steamship Exchange, with a reference to a Commissioner to determine the amount of damage. Proposed findings of fact and conclusions of law shall be submitted promptly and upon three days notice.