**ZIMA CORPORATION and Schweiter Corporation, Plaintiffs,**

v.

**M. V. ROMAN PAZINSKI, her boilers, etc., Polish Ocean Lines and Panalpina Welttransport Gmbh. Hamburg, Defendants.**

**No. 78 Civ. 5022 (WCC).**

United States District Court, S. D. New York.

Jan. 18, 1980.

On Request to Reconsider Feb. 25, 1980.

Kirlin, Campbell & Keating, New York City, for defendant Panalpina Welttransport Gmbh. Hamburg; Richard H. Sommer, Armand Maurice Pare, Jr., New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Plaintiff Schweiter Corporation of Spartanburg, South Carolina (hereafter "Schweiter Spartanburg") moves for partial summary judgment against defendant Panalpina Welttransport Gmbh. Hamburg (hereafter "Panalpina Hamburg") on the issue of Panalpina Hamburg's liability as a carrier for the loss of certain machinery shipped to plaintiff aboard the M/V ROMAN PAZINSKI. In the alternative, plaintiff moves for a stay of this action pending a hearing as to Panalpina Hamburg's carrier status before the Federal Maritime Commission (hereafter "FMC") on the grounds that the FMC has primary jurisdiction over this issue. Defendant Panalpina Hamburg cross-moves for summary judgment; in the alternative, defendant moves for an order enforcing the forum selection clause in the bill of lading on which defendant's carrier status is based. For the reasons outlined below, plaintiff's motions are denied; defendant's motion for summary judgment is granted as to plaintiff's claims against defendant based on defendant's status as a common carrier; and defendant's motion to dismiss based on the forum selection clause is granted as to any other claims plaintiff may have against defendant under defendant's bill of lading.

*The Facts*

Plaintiff Schweiter Spartanburg purchased a number[1] of automatic cone winders, a type of textile machinery, from its parent corporation, Schweiter Engineering Works, Ltd. of Horgen, Switzerland (hereafter "Schweiter Horgen"). Although the terms of the sale agreement called for delivery at Schweiter Horgen's plant,

Hill, Rivkins, Carey, Loesberg & O'Brien, New York City, for plaintiffs; Robert E. Daley, New York City, of counsel.

---

1. The terms of the purchase order produced by plaintiff call for seven such machines. The "Confirmation of Order" also produced calls for twelve; apparently this confirms more than one such order. The parties agree that seven machines were loaded on the M/V ROMAN PAZINSKI; the loss of these seven machines underlies this complaint.

Schweiter Horgen arranged for subsequent shipment to South Carolina and related insurance on behalf of Schweiter Spartanburg, contacting Panalpina AG of Zurich, Switzerland to insure the machines against all risks from "factory to factory,"[2] and contacting either Panalpina AG or a related Panalpina company in Zurich (Panalpina Forwarding, Ltd. or Panalpina World Transport, Ltd., hereafter, collectively, "Panalpina Zurich")[3] with regard to shipment. On the same date that Schweiter Horgen invoiced Schweiter Spartanburg for the machines, Schweiter Horgen advised Schweiter Spartanburg that the goods would be shipped on the M/V ROMAN PAZINSKI from Bremen to Wilmington, North Carolina.[4]

The machinery was loaded at the Schweiter Horgen factory into an empty container furnished by Panalpina Zurich. The machinery was then shipped by rail to Bremen. At Bremen, pursuant to arrangements made by another Panalpina company, Panalpina Hamburg, through booking agent Walter Sporleder, the cargo was loaded aboard Polish Ocean Lines' vessel ROMAN PAZINSKI.

On the voyage from Bremen to Wilmington, the container was lost overboard. Polish Ocean Lines notified the consignee named on its bill of lading, Panalpina International Freight Forwarding, Ltd., of Greer, South Carolina (hereafter "Panalpina South Carolina") that the container had been lost, and the various interested parties initiated claims against their respective insurers. Schweiter Spartanburg subsequently filed this suit for cargo damages against Polish Ocean Lines and Panalpina Hamburg, alleging that the defendants had breached their duties and obligations as common carriers "and were otherwise at fault."

*The Documents*

The dispute between the parties to these motions—plaintiff and defendant Panalpina Hamburg—centers on the nature of Panalpina Hamburg's undertaking with respect to transportation of the Schweiter container: whether Panalpina Hamburg undertook to transport the container safely to its destination, thus assuming the status of a common carrier, or undertook merely to arrange for transportation of the goods, thus assuming the more limited liability of a freight forwarder. Four documents are particularly relevant to this dispute. The first is an invoice prepared on November 12, 1977, by Panalpina Forwarding Ltd., Zurich, billing either Schweiter Horgen or Schweiter Spartanburg[5] $2,648 for "freight from Horgen to C & F Wilmington according to our offer" for the machinery in question, listing Schweiter Spartanburg as the consignee, Bremen as the loading port, Wilmington as the arrival part, and the ROMAN PAZINSKI as the ship. This document further states:

> "All forwarding, shipping, insurance, etc. are done as agents only and carried out under the 'general terms and conditions of the Association of the Swiss Forwarding Agents' (latest issue)."

The general conditions of that Association effective as of November 1, 1967 provide in Article 1 that:

> on the agreement between the Zurich company or companies and Panalpina Hamburg, this opinion will refer to the Zurich companies collectively as "Panalpina Zurich" unless the reference occurs in connection with documents specifying a particular Zurich company.

2. Schweiter Horgen invoice, sent to Schweiter Spartanburg on November 25, 1977.

3. Defendant contends that the original contact by Schweiter Horgen was with Panalpina World Transport Ltd., Zurich; plaintiff contends that Schweiter Horgen hired both Panalpina AG and Panalpina World Transport to "arrange for the transportation of this shipment from Horgen, Switzerland to its ultimate destination." The documents refer variously to the two companies above, "Panalpina Zurich," and "Panalpina Forwarding Ltd., Zurich."

Since the critical issues here rest not on Schweiter Horgen's agreements with the various Panalpina companies in Zurich but rather

4. Schweiter Horgen forwarding advice to Schweiter Spartanburg, also dated November 25, 1977.

5. The typed-in addressee is Schweiter Horgen; on the copy submitted, however, this is crossed out by hand and "Schweiter Corp., Spartanburg/USA" is listed as addressee.

"[t]he taking over and forwarding of articles of any kind is carried out on the basis of the regulations, conditions and clauses *in the bills of lading of the freight carriers used for the transport . . . ."* (emphasis added).

The second and third documents are the two bills of lading issued in connection with this shipment. The first of these, numbered 565.363, issued by Polish ocean lines, names Panalpina Hamburg as shipper, Panalpina South Carolina as consignee, Hamburg as the port of loading, and Wilmington, North Carolina as the port of discharge. This bill of lading contains clauses incorporating the York-Antwerp Rules on General Average, limiting the ship's liability for superficial rust damage to iron and steel products, specifying the procedures to be followed by the ship's master in issuing bills of lading, and discharge of the cargo at the named port of discharge.[6] The second bill of lading, also numbered 565.363, was issued by Panalpina Hamburg. This bill of lading names Panalpina Zurich as the shipper, and Panalpina South Carolina as the consignee; states that freight is payable at Hamburg; lists Bremen as the loading port and Wilmington as the port of discharge; and contains the same description of the container shipped and of the terms of shipment ("freight prepaid, shipped on board, house to house") as does the Polish Ocean Lines bill of lading. The document further states, however, that:

"The Panalpina Welttransport Gmbh in carrying out the orders of the shipping and/or other person or persons having the right to dispose of the goods do not act as common carriers but solely as forwarders in accordance with the latest edition of the Allgemeine Deutsche Spediteurbedingungen (ADsp)[7] and in accord-

ance with the regulations, terms of business and tariffs of the Railways, Maritime Companies and/or other forwarding concerns and intermediary institutions engaged in the carriage of said goods and in force at the time of transport. They shall not be responsible for loss or damage caused by any act of God or by actions of the carriers and/or others engaged in the transport of the said goods and/or their agents.

\* \* \*

"Disputes arising from this contract shall be subject to German law, and the Hamburg Courts of Justice shall be competent only."

The document makes no reference similar to those in the Polish Ocean Lines bill of lading to allocation of risk of cargo damage during the voyage, general average, procedures to be followed by the ship's master in accepting goods for shipment, or discharge of the cargo.

The fourth document, dated December 16, 1977, is an invoice from Panalpina Hamburg to either Panalpina Zurich (hereafter "Addressee 1") or Panalpina South Carolina (hereafter "Addressee 2") for Panalpina Hamburg's services in connection with this container shipment. The document lists a charge for "lumpsum" ocean freight, and itemizes other container-related services provided to Panalpina Zurich.

*Contentions*

Plaintiff contends that the bill of lading issued by Panalpina Hamburg is evidence of a contract for the carriage of goods, see the preamble to the Carriage of Goods by Sea Act (hereafter "COGSA"), 46 U.S.C. § 1300, and that Panalpina Hamburg, while concededly not the owner or the operator of the

---

6. "Shipped on board in apparent good order and condition, unless otherwise stated, and to be discharged at the aforesaid port of discharge or so near thereto as the vessel may safely get and be always afloat."

7. German Forwarders' Standard Terms and Conditions. (1972 ed.).
   Under these terms and conditions, carriers, warehousemen, ship's masters, intermediate or sub-forwarders, insurers, depots, banks or oth-

er third parties "are not deemed to be agents of the forwarder for the purposes of carrying out his contract," Article XIII, ¶ 52. The forwarder is authorized to act as a carrier, but may charge freight and will assume liability as a carrier only if he "makes use of this authorization," *id.*; if a forwarder does undertake to become a carrier, his liability is limited in accordance with further terms of Article XII.

ROMAN PAZINSKI, stands in the position of a "charterer" in COGSA terms, see 46 U.S.C. § 1301(a), by holding itself out to carry goods for hire to a certain destination. Plaintiff suggests that an analogy may be found in the FMC's interpretation that certain persons offering carriage of goods in ocean commerce who do not themselves own or operate vessels may be "non-vessel operating common carriers by water" subject to the provisions of the Shipping Act of 1916, 46 U.S.C. § 801 *et seq.* Plaintiff further points to defendant's issuance of a bill of lading, its charging of an ocean freight rate allegedly higher than that defendant was charged by Polish Ocean Lines, the designation of defendant as "shipper" on the Polish Ocean Lines bill of lading, and the advertising by all the Panalpina companies of a "Panalpina World Transport System" and of Panalpina services as an "indirect carrier," and argues that Panalpina Hamburg's description of its services in the Panalpina Hamburg bill of lading for this shipment as "not . . . as common carriers but solely as forwarders" is not sufficient to preclude inquiry into defendant's carrier status. Plaintiff argues in the alternative that the Court should stay resolution of plaintiff's action against Panalpina Hamburg pending a determination by the Federal Maritime Commission of defendant's status as either a common carrier or a freight forwarder.

Defendant argues that it did not agree to act as a carrier of goods—one who undertakes to transport goods—in either its bill of lading or its course of conduct with respect to this shipment, while both the general contract law underlying the COGSA preamble reference to "contract for the carriage of goods by sea" and any interpretation of "carrier" status by the FMC require that a carrier assume responsibility for the actual transportation and delivery of goods. Defendant argues that it contracted only to act as a freight forwarder—one who arranges for a carrier to transport goods, as well as for other miscellaneous matters associated with the shipment of goods such as customs clearance and licensing. In sup-

port of this contention, defendant points to the unambiguous "forwarder" language contained in the Panalpina Hamburg bill of lading; the language in the general Panalpina advertising cited by plaintiff which describes Panalpina services as those of "international freight forwarders"; documents covering the freight Panalpina Hamburg charged Panalpina Zurich, which defendant says show, after a more careful inspection than that given by plaintiff, that the freight Panalpina Hamburg charged Panalpina Zurich was slightly less than the freight Polish Ocean Lines charged Panalpina Hamburg and that Panalpina Hamburg did not make its profit from consolidating shipments by various shippers such as plaintiff, but rather, from the commissions it received from booking agents such as Walter Sporleder; Panalpina Hamburg's failure even to plan for or supervise shipment of the cargo farther than Wilmington, whereas the cargo's ultimate destination was Spartanburg; Panalpina Hamburg's failure to charge a rate covering the entire transportation of the machinery even from Horgen to Bremen/Hamburg; Schweiter Horgen's previous course of dealings with Panalpina Zurich in arranging for shipment via Polish Ocean Lines; and the fact that Schweiter Horgen and Schweiter Spartanburg knew almost simultaneously with completion of their sale contract that the goods would be shipped on the ROMAN PAZINSKI. Defendant further maintains that the Panalpina Hamburg bill of lading in question was intended only for Panalpina Zurich, and was never issued directly to either plaintiff or to plaintiff's agent, Schweiter Horgen.

In the alternative, defendant contends that, pursuant to the terms of the Panalpina Hamburg bill of lading, disputes are to be resolved in accordance with German law in the Hamburg courts; and that under the principles of *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972), that choice of forum clause should be honored and the action dismissed.

*Defendant's Liability as a Common Carrier*

### 1. Legal Standard

█ Plaintiff's allegation that defendant is liable as a common carrier [8] rests on the distinction between those freight forwarders "who in essence, act as export departments for their shipping clients" in securing cargo space on a vessel, advising on licensing and letter of credit terms, getting the shipment to the dock on time, clearing Customs, etc., *New York Foreign Freight Forwarders & Brokers Assn. v. FMC*, 337 F.2d 289 (2d Cir. 1964), *cert. denied*, 380 U.S. 910, 914, 85 S.Ct. 893, 902, 13 L.Ed.2d 797, 800 (1965); see *Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 484–85, 69 S.Ct. 692, 701, 93 L.Ed. 363 (1949); *J. C. Penney Co. v. American Express Co.*, 102 F.Supp. 742 (S.D.N.Y. 1951), *aff'd*, 201 F.2d 846 (2d Cir. 1953); and others billing themselves as freight forwarders who hold themselves out "not merely to arrange with common carriers for the transportation of the goods, but rather to deliver them safely to the consignee," *Acme, supra*, 336 U.S. at 484, 69 S.Ct. at 701, in which case the forwarder acts as shipper with respect to the carrier who actually transports the goods and as carrier with respect to the original shipper, see *Aquascutum of London v. S. S. AMERICAN CHAMPION*, 426 F.2d 205, 210 (2d Cir. 1970) (discussing forwarder/forwarder-carrier distinction in the context of whether defendant had had sufficient contacts with New York to create jurisdiction over defendant). Factors to be considered in determining whether a party acted only as a forwarder or as a forwarder-carrier include (1) the way the party's obligation is expressed in documents pertaining to the agreement, *J. C. Penney, supra*, although the party's self-description is not always controlling, see *Investigation of the Activities, Filing Practices, etc. of Containerships*, 9 FMC 56 (1965) (FMC inquiry on compliance with rate regulation under the Shipping Act); *Bernhard Ulmann Co., Inc. v. Porto Rican Express Co.*, 3 FMB 771, 1952 AMC 447 (1952) (similar inquiry by FMC precursor); (2) the history of dealings between the parties, *J. C. Penney, supra*; (3) issuance of a bill of lading, *Aquascutum, supra*, although the fact that a party issues a document entitled "bill of lading" is not in itself determinative, *J. C. Penney, supra; A. Gagniere & Co. v. The Eastern Company*, 7 Lloyd's List L.R. 188, 189 (K.B.), *aff'd*, 8 Lloyd's List L.R. 365 (Ct.App.1921); *cf. Sucrest Corp. v. M/V Jennifer*, 455 F.Supp. 371, 380 n. 16 (D.C.Me.1975) (COGSA would apply *if* bill of lading served as contact for carriage of goods); (4) how the party made its profit, in particular, whether the party acted as "agent of the shipper . . . procuring transportation by carrier and handling the details of shipment" for fees "which the shipper paid in addition to the freight charges of the carrier utilized for the actual transportation." *Acme, supra*, 336 U.S. at 484, 69 S.Ct. at 701, in which case the party would be liable only as a forwarder, *id.*; or whether the party "picked up the less-than-carload shipment at the shipper's place of business and engaged to deliver it safely at its ultimate destination . . . [charging] a rate covering the entire transportation and [making] its profit by consolidating the shipment with others to take advantage of the spread between carload and l. c. l. rates," while the shipper "seldom if ever knew which carrier would be utilized in the carriage of his shipment," *id.* In the second case, the forwarder would be liable as a carrier. The fact that the alleged carrier may not own the carrying vessel is not determinative, see *J. C. Penney, supra; A. Gagniere, supra; cf. Ulmann, supra.*

---

**8.** For purposes of this discussion, the Court assumes that the plaintiff's allegations state a cause of action under COGSA, 46 U.S.C. § 1300 *et seq.*, so that United States law as to when a party has entered into a contract of carriage under the preamble to COGSA, 46 U.S.C. § 1300, applies. If the contract at issue does not fall under COGSA, the choice of German law under the contract would appear to prevail, but so would the choice of forum clause, see discussion *infra*, so that the Court does not need to consider whether and in what respects German law on common carriers differs from our own.

■ Under these cases, a freight forwarder is liable for lost or damaged goods only for its own negligence, including negligence in choosing a carrier; but a forwarder who contracts to deliver the goods to their destination, as well as or instead of arranging for their transportation, becomes liable as a common carrier for loss or damage to the goods, whether the fault or other basis of liability for damage lies with that forwarder or with the underlying carrier actually transporting the goods. *Acme, supra; J. C. Penney, supra; Aquascutum, supra.*

## 2. Discussion

■ Under this standard, defendant is entitled to summary judgment on the issue of its liability as a common carrier under Rule 56, F.R.Civ.P.[9] The material facts underlying this issue are not in dispute: the parties do not contest the authenticity of the documents produced, or of the Panalpina advertising quoted; nor do they dispute the timing of the events in relation to the shipment of this container, or the existence of a prior pattern of dealings between Schweiter Horgen and Panalpina Zurich.[10] Defendant has shown that even if all inferences favorable to plaintiff are drawn from these undisputed facts, under the standard of *Acme, supra,* and *J. C. Penney, supra,* or the comparable standard applied by the FMC under the Shipping Act, see *e. g., Ulmann, supra,* defendant did not undertake to act as a common carrier with respect to this shipment.

## a. Bill of Lading

■ If it is assumed that the defendant's carrier status arises from the Panalpina Hamburg bill of lading—so that the agreement is assumed to be between Panalpina Hamburg and Panalpina Zurich acting as agent for Schweiter Horgen, which in turn was acting as agent for Schweiter Spartanburg—the agreement by its terms is one for freight forwarding. No carrier status arises solely from the issuance of a document *labelled* a bill of lading, *J. C. Penney, supra.* In addition, this bill of lading states unambiguously that Panalpina Hamburg was acting not as a carrier but solely as a forwarder and refers to the German Forwarders' Standard Terms and Conditions, which limits a freight forwarder's liability to that of a forwarding agent unless the forwarder expressly assumes common carrier status (in contrast to the Polish Ocean Lines bill of lading of the same format and number, which contains no such references or limitations). Moreover, even if it is assumed that the document's heading and form as a bill of lading creates a sufficient ambiguity to warrant examination of extrinsic evidence, the extrinsic evidence is consistent with defendant's assumption of liability as a freight forwarder only. Neither party has described any course of dealing between Panalpina Zurich and Panalpina Hamburg which might show that this contract was a contract of carriage rather than the second in a series of forwarding contracts between two related companies.

**9.** Rule 56(c) provides that a party seeking summary judgment must show (1) that no genuine issue exists as to any material fact, and (2) that the moving party is entitled to summary judgment as a matter of law.

In contract cases, if the contract at issue " ' . . . is so ambiguous as to require resort to other evidence to ascertain its meaning and that evidence is in conflict, the grant of summary judgment [would be] improper . . . ' " *Heyman v. Commerce & Industry Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975), quoting *Painton & Co. v. Bourns, Inc.,* 442 F.2d 216, 233 (2d Cir. 1971).

This is true even when both parties have moved for summary judgment, *Heyman, supra,* 524 F.2d at 1320. This case is not, however, analogous to that in *Heyman, supra,* since nei-

ther the documents nor the extrinsic evidence on the issue of the nature of defendant's undertaking is "in conflict" in any material respect, see text, *infra.*

**10.** While the parties do disagree as to whether the Panalpina Hamburg bill of lading was transmitted to Schweiter Horgen prior to commencement of this lawsuit, this dispute is not material, since it may be assumed for purposes of this motion that Panalpina Zurich received the bill of lading while acting in the capacity of agent for Schweiter Horgen, which in turn, was acting for Schweiter Spartanburg, or even more favorably to plaintiff, that the several Panalpina companies were acting as one, see text *infra.*

The document, in fact, appears to have been issued to facilitate arrangements between related freight forwarders on either ends of a sea voyage, a purpose specifically held not to constitute a contract of carriage in *J. C. Penney, supra.* Nor can any inference be drawn from the documents and deposition testimony submitted that Panalpina Hamburg made its profit through consolidating this shipment with other such shipments, leading to carrier status under the *Acme* test: Panalpina Hamburg received a full container, not a partial containerload; both Panalpina Zurich and the Schweiter companies knew precisely on what vessel the machinery would be shipped, as early as the date of Schweiter Horgen's invoice to Schweiter Spartanburg covering the sale of the machinery; and the Panalpina Hamburg-Panalpina Zurich invoice and related deposition testimony indicate that Panalpina Hamburg charged Panalpina Zurich for sea freight in an amount approximately equivalent to Panalpina Hamburg's total expenses in arranging for sea shipment, and made its profit from the transaction from either its forwarder's commission from Panalpina Zurich or from its broker's commission for arranging the shipment with Walter Sporleder, rather than from a difference between an individual container rate charged to Panalpina Zurich and a bulk cargo rate charged by Polish Ocean Lines.[11]

b. Concerted action by Panalpina Companies

Furthermore, even if it is assumed, most favorably to plaintiff, that all the Panalpina companies—Panalpina Zurich, Panalpina Hamburg, and Panalpina South Carolina—were acting as one company, see *J. C. Penney, supra*, the only reasonable inference that can be drawn from these facts is that these companies acting in concert did not undertake to act as a carrier.[12]

First, the individual undertakings of the component Panalpina companies cannot reasonably be read to include assumption of carrier liability. Panalpina Hamburg's undertaking, as described above, is that of a freight forwarder only. Panalpina Zurich's undertaking appears similar: it billed Schweiter Horgen/Schweiter Spartanburg for the component freight costs of the voyage, see its invoice of November 12, rather than for freight for the entire voyage from Horgen to Spartanburg; named the carrier and vessel to be used; and clearly incorporated in its invoice the terms and conditions of the Swiss Forwarding Agents' Association, terms with which Schweiter Horgen, with its undisputed history of making such arrangements through Panalpina Zurich, should have been familiar, and which describe forwarding rather than combined forwarder-carrier arrangements. The collateral agreement between Schweiter Horgen and Panalpina AG, Zurich to insure the goods may add support to this conclusion, see *A. Gagniere, supra.* Panalpina South Carolina's undertaking, as described in the deposition of Schweiter Horgen's shipping manager, was to see that the machinery reached Spartanburg. The manager variously referred to this undertaking as one in which Panalpina South Carolina would "make arrangements," "ship," "transport" or "make arrangements to transport." The expressions which do not include the word "arrange" either do not mean "carry" ("ship," which in cargo terms indicates consignment to a carrier for delivery) or appear to be ambiguous in translation from the German ("transport").

Secondly, there is no basis for inferring that the Panalpina companies acting in concert undertook to serve as a carrier even though the individual Panalpina companies

11. While the Panalpina Hamburg profit via commission may in fact have come because Panalpina Hamburg arranged such a number of shipments through Walter Sporleder, this would merely emphasize Panalpina's dual role as a forwarding agent and a *broker* (subject, perhaps, if the brokerage had occurred in the United States, to certain regulations under the Shipping Act, see *New York Freight Forwarders, supra* ); it would not make defendant the type of consolidating forwarder-carrier described in *Acme, supra.*

12. This assumption moots any possible issue of fact over the initiating point of the Panalpina Zurich-arranged shipment.

did not. The fact that the various Panalpina companies were contacted with respect to each leg of the shipment—from Horgen to Bremen, Bremen to Wilmington, and Wilmington to Spartanburg—does not, without more, give rise to an inference that Panalpina assumed carrier status, see *J. C. Penney, supra*. The advertising of the related Panalpina companies, which plaintiff points to as further evidence of a Panalpina undertaking to act as a carrier, even if read in conjunction with Panalpina's involvement in each leg of the shipment, does not give rise to such an inference either. The advertising is general copy, rather than being directed at a particular shipment, such as that by Schweiter Horgen; it contains specific language describing Panalpina services as those of "international freight forwarders"; and certain ambiguous terms in the advertising ("world transport system" and "indirect carrier") cannot, in the context of more specific language in the advertisements themselves ("international freight forwarder") and in the documents related to this particular shipment, be read to imply that Panalpina undertook to act as a carrier with respect to the Schweiter machinery.

In summary, even if all the possible inferences favorable to plaintiff are read together, the Schweiter arrangements with the Panalpina companies still appear analogous to those in *J. C. Penney, supra*, where several related American Express companies ar-

ranged to ship certain goods from a point inland to a port, booked passage on a carrying vessel, issued an in-house bill of lading covering the entire through trip, arranged to pick up the goods at the delivery port, and would have arranged (if the goods had not arrived at that port in a damaged condition) for transportation of the goods to their final destination. As in *J. C. Penney, supra*, no carrier liability will attach to such an arrangement; defendant's motion for summary judgment on the issue of its liability as a common carrier is therefore granted.

*Other Claims Against Defendant*

■ Insofar as plaintiff's complaint further states a claim against defendant as a freight forwarder, the forum selection clause contained in the Panalpina Hamburg house bill of lading requires the Court to dismiss such claims so that they may be litigated in the first instance in the forum selected by the parties.[13] *The Bremen v. Zapata Off-Shore Co., supra*.

■ Under the principles laid down in *Bremen*, a forum selection clause in an international commercial contract negotiated without fraud between parties of equal bargaining power is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Id.*, 407 U.S. at 10, 10–12, 92 S.Ct. at 1913.[14] Here,

---

**13.** The forum selection clause might also be argued to preclude summary judgment on the issue of defendant Panalpina Hamburg's liability as a common carrier. However, determination of whether or not the forum selection clause should apply necessarily requires an initial determination of whether the contract here falls under COGSA, and thus under the principles of *Indussa Corporation v. S. S. Ranborg*, 377 F.2d 200 (2d Cir. 1967) and *Roach v. Hapag-Lloyd*, 358 F.Supp. 481 (N.D.Cal.1973) rather than under the principles of *Bremen*, see discussion at note 14 *infra*. Once that initial determination has been made, granting summary judgment on the issue of defendant's status as a carrier in effect enforces the forum selection clause by denying plaintiff access to this forum on those claims.

**14.** Plaintiff argues that under *Indussa, supra*, neither the test nor the burden of proof alloca-

tion in *Bremen* should apply to this case. *Indussa* held that in a cargo damage action subject to COGSA, a forum selection clause in a bill of lading would not be enforced; the holding was based on Congress's express intent in § 3(8) of COGSA prohibiting bill of lading terms which would reduce a carrier's liability, coupled with the Court's determination that forcing a United States shipper to litigate a claim in a foreign court in effect reduced the carrier's liability. In this case, as in *Bremen*, *id.* at 407 U.S. 10 n.11, 92 S.Ct. at 1913 n.11, and *Roach v. Hapag-Lloyd, supra*, COGSA does not apply on its face; nor would the choice of a German forum appear so to inconvenience plaintiff that defendant's potential liability would be lessened, since plaintiff's two agents, Schweiter Horgen and Panalpina Zurich, have had a history of dealing in a German forum, since the potential witnesses may more easily be brought to that forum than to a United

the parties to the arrangement—whether viewed narrowly as Panalpina Hamburg and Schweiter Spartanburg (through its agents Schweiter Hamburg and Panalpina Zurich), or broadly as all the Panalpina companies and all the Schweiter companies—are sophisticated international dealers, and plaintiff has not alleged that the resulting agreement was the product of fraud or overreaching. Nor is the chosen forum seriously inconvenient for the trial of these issues, since the direct parties to the agreement, as well as the parties to the Schweiter Horgen-Panalpina Zurich agreement underlying the Panalpina Zurich-Panalpina Hamburg agreement, are either Swiss or German. Finally, while the forum chosen is not "neutral" in the *Bremen* sense, since it is the home base of Panalpina Hamburg, plaintiff has not shown that litigation in that forum would be "unjust" considering the history of ongoing business relations between the Panalpina companies and plaintiff's agent and parent company, Schweiter Horgen. For the foregoing reasons, plaintiff's additional claims against Panalpina Hamburg are dismissed, subject to Panalpina Hamburg's waiver of any defenses in the Hamburg courts based on statutes of limitation or laches, see *Kooperativa Forbundet v. Vaasa Line Oy*, 1975 AMC 1972, 1975 (S.D.N.Y.1975).

*Stay Pending FMC Determination*

██ Finally, plaintiff's alternative contention, that this Court should stay its ruling pending a hearing by the FMC to determine defendant's status as a carrier, may be dismissed without lengthy discussion. Under the doctrine of primary jurisdiction

". . . in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress *for regulating the subject matter* should not be passed over." *Far East Conference v. United States*, 342

U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1951) (emphasis added).

The authority of the FMC is set out in various provisions of the Shipping Act of 1916, as amended, 46 U.S.C. § 801 *et seq.*, and encompasses the regulation of liner conferences and rates, docking, warehousing, and other practices involving the handling of freight, and the licensing of freight forwarders arranging to ship goods from the United States abroad. See *Far East Conference, supra* (conference rate system); *New York Foreign Freight Forwarders, supra* (freight forwarders). The FMC does not supervise individual freight shipments, nor regulate the matter of damages for loss of cargo. Whether or not defendant is liable as a common carrier rests first, on an interpretation of the nature of defendant's contractual undertaking, and second, on an application of the provisions of COGSA, 46 U.S.C. § 1300 et seq., both matters well within the traditional competence of the courts. Deference to the FMC in such a case is inappropriate. See *United States v. Pan American Mail Line*, 359 F.Supp. 728, 732 (S.D.N.Y.1972).

*Conclusion*

Plaintiff's motions for summary judgment and to stay this action pending submission of the issue of defendant's carrier status to the FMC are denied. Defendant's motion for summary judgment on the issue of its liability as a common carrier is granted. Defendant's motion to dismiss in view of the forum selection clause in its bill of lading is granted as to any other claim plaintiff has asserted against defendant.

SO ORDERED.

On Request to Reconsider

After having considered the submissions of the parties relating to plaintiff's request to reconsider the Court's opinion and order of January 18, 1980, the Court finds that plaintiff has neither adduced additional facts[1] nor advanced additional arguments

States forum, and since the amount in question appears sufficient to justify travel to Hamburg by a Schweiter Spartanburg representative, see *Roach v. Hapag-Lloyd, supra*; see also *Koo-*

*perativa Forbundet v. Vaasa Line Oy*, 1975 A.M.C. 1972 (S.D.N.Y.1975).

1. The one new assertion raised by plaintiff is

which would support any amendment to the Court's opinion. The request is therefore denied.

The opinion is, however, amended *nunc pro tunc* to provide that with . . . respect to the dismissal of plaintiff's claims based on grounds other than carrier status under the forum selection clause, see page 277, the dismissal is conditioned on defendant Panalpina Hamburg's waiver of defenses based on the running of statutes of limitation or laches only during the period between the time this complaint was filed and the date of this amended order.

SO ORDERED.

the discrepancy between the Schweiter Horgen invoice of November 25, 1977 and Schweiter Horgen's deposition testimony on the insurance arrangements which Schweiter Horgen made with respect to this shipment. Even if such deposition testimony should be credited over the explicit wording of the invoice, however, such a finding would weaken, rather than strengthen, plaintiff's argument that the Panalpina companies acted in concert as a freight forwarder, and is irrelevant to plaintiff's argument that Panalpina Hamburg acted alone as a freight forwarder.