643 F.2d 987
 Arnold HOFFMAN and Mary Hoffman, Appellees,
v.
NATIONAL EQUIPMENT RENTAL, LTD., a corporation, Appellant,
and
Advanced Leasing Services, Inc., a corporation; and Eagle
Mortgage Co., a corporation; and Dairy Farm
Leasing Co., a corporation, Defendants.
 No. 79-1743.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1980.
Decided Jan. 12, 1981.
Rehearing Denied Feb. 18, 1981.
 
 Lawrence J. Lewis, Huntington, W. Va. (Vinson, Meek, Lewis, Peoples & Pettit, Huntington, W. Va., Charles Jacobson, Dorfman & Jacobson, Jeriche, N.Y., on brief) for appellant.
 William D. Levine, Huntington, W. Va. (Marshall & St. Clair, Huntington, W. Va., on brief) for appellee.
 Before BRYAN, Senior Circuit Judge, and RUSSELL and WIDENER, Circuit Judges.
 ALBERT V. BRYAN, Senior Circuit Judge:
 
 
 1
 This appeal evolves from an action begun on August 6, 1975 in the Federal Court for the Southern District of West Virginia by Arnold F. Hoffman, a citizen dairy farmer in that State, and his wife, Mary, against National Equipment Rental, Ltd. (NER), a Delaware corporation. As ultimately tried, their complaint alleged breach of warranty and usury under a lease of 21 dairy cows by NER's assignor.[1]
 
 
 2
 NER not only denied liability of any kind, but counterclaimed on the basis of a judgment entered July 11, 1975, by the Supreme Court of the State of New York, County of Nassau, awarding NER the sum of $36,458.68 as the amount due by the Hoffmans under the lease. The District Court on cross-motions for summary judgment refused to accord full faith and credit to the New York judgment. Instead, it submitted the claims of both parties to a jury for special findings and, on May 15, 1979, accepted a verdict awarding to the plaintiffs $72,266.00 and to NER $30,654.22. The Court then gave judgment to the Hoffmans for the net difference of $41,611.78.
 
 
 3
 We reverse the trial court for error in the rejection of the New York judgment which, we hold, concludes adversely all of the Hoffmans' claims.
 
 I.
 
 4
 Under the lease and guarantee signed by them on July 24, 1974 the Hoffmans covenanted to make 50 monthly rental payments of $693.00 with the proviso that two payments be made in advance. After the final payment they were to be entitled to buy the cows for one dollar. The Hoffmans made no payments after May 1975, due to their dissatisfaction with the cows. They charged that the animals did not produce the quantity of milk promised before the lease was closed, that their health was impaired, and that some had died soon after delivery; they maintained that these complaints went unanswered.
 
 
 5
 NER commenced its New York action to recover the unpaid lease moneys in May 1975. The Hoffmans failed to appear, and the judgment noted above was obtained by default. The lease, signed in New York by NER's assignor after it had been executed by the Hoffmans in West Virginia, specified the method and mechanics of execution and embodied the parties' agreement as to the governing law, service of process, and choice of jurisdiction. It provided as follows:
 
 
 6
 24. EXECUTION: LAWS GOVERNING: SERVICES: This lease shall only be binding when accepted by Lessor at its New York, N. Y. office and shall be deemed to have been made in New York County, New York and shall be governed by the laws of the State of New York except for local recording statutes. As part of the consideration for the Lessor's executing this Lease, Lessee agrees that all actions or proceedings arising directly or indirectly from this Lease shall be litigated only in courts having situs within the State of New York and the Lessee hereby consents to the jurisdiction of any local, state or federal court located within the State of New York and waives personal services of any and all process upon the Lessee herein, and consents that all such service or process shall be made by certified mail, return receipt requested, directed to the Lessee at the address hereinabove stated; and service so made shall be complete two (2) days after the same shall have been posted as aforesaid.
 
 
 7
 The guarantee executed by Mary Hoffman contained a nearly identical provision.
 
 
 8
 When NER sought enforcement of its New York judgment, the District Court, following the reasoning of Leasewell, Ltd. v. Jake Shelton Ford, Inc., 423 F.Supp. 1011 (S.D.W.Va.1976), considered that its task was to determine the enforceability of the quoted provision under West Virginia law. This was error. If the New York court entering judgment had jurisdiction under New York law and the United States Constitution, then its judgment was entitled to full faith and credit. U.S.Const. art. IV § 1. We disapprove of Leasewell to the extent that it holds otherwise.
 
 
 9
 Contracts designating a particular forum for litigation, and agreements specifying a particular mode of service of process, have been approved by both Federal and New York State courts.[2] Thus, there is no inherent infirmity in the choice-of-forum and service-of-process provisions, under either New York or Federal law, sufficient to justify the denial of full faith and credit to NER's New York judgment.
 
 
 10
 However, the Hoffmans question the New York judgment on the ground that they received no service of process or other notice of the institution of the action. Squarely decisive here is the contractual language already quoted. Particularly apposite is the following:
 
 
 11
 (T)he Lessee hereby ... waives personal services of any and all process upon the Lessee herein, and consents that all such service or process shall be made by certified mail, return receipt requested, directed to the Lessee at the address hereinabove stated; and service so made shall be complete two (2) days after the same shall have been posted as aforesaid.
 
 
 12
 In view of the broad power of the contracting parties "to permit notice to be served by the opposing party, or even to waive notice altogether," National Equipment Rental, Ltd. v. Szukhent, 375 U.S. at 316, 84 S.Ct. at 414, NER's implementation of the agreed-upon service mechanism would appear to provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). The Hoffmans consented to, and NER invoked, an arrangement "reasonably certain to inform those affected," id. at 315, 70 S.Ct. at 657, and the jurisdiction obtained pursuant to that arrangement is not vulnerable.
 
 
 13
 Further, the evidence confirms the actuality of notice to the Hoffmans. Throughout the period of this controversy, they resided at the address stipulated by the contract for service of process. It is undisputed that envelopes correctly addressed and with requisite postage were seasonably sent via certified mail, return receipt requested, containing summons and complaint in the action leading to the judgment against them. These envelopes were returned to NER bearing the notation "refused."
 
 
 14
 There is no basis for any supposition that the postal service did not tender the certified mail. The only fair and reasonable explanation is that the postal authorities wrote "refused" with the meaning that it was refused by the Hoffmans. Certainly the letter carrier had no reason to reject the mail. Grannis v. Ordean, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 (1914), establishes that, even with measures less painstaking and certain than those employed by NER, the presumption is "clear and strong" that notice-bearing letters reach their intended addressees. Id. at 397-98, 34 S.Ct. at 784. See Comprehensive Merchandising Catalogs, Inc. v. Madison Sales Corp., 521 F.2d 1210, 1212 (7th Cir. 1975) (service by certified mail upheld when letter returned to plaintiff marked "refused").
 
 
 15
 It follows that the New York judgment irrevocably bound the Hoffmans to its adjudication of their indebtedness and foreclosed their claims of usury and breach of implied warranty of merchantability.
 
 II.
 
 16
 Since the New York judgment is also attacked by challenge to the validity of the contract, we emphasize that no hint of vitiating duress, mistake, or inequality of bargaining power mars its formation.
 
 
 17
 According to his testimony Arnold Hoffman throughout this period resided with his wife at Red House, West Virginia where he operated a dairy as he had done for 25 years. His 31 or 32 Holstein cows ranged in value from $600.00 to $1,000.00 each. In March 1974 he wished to increase his herd so as to expand the production and sale of milk.
 
 
 18
 Hoffman inquired at a local bank about a loan but, he testified, it was neither granted nor denied. Apparently he did not press his inquiries there. Two neighbors who had leased cows referred him to an individual named McKenzie who, when first approached, was unable to help. Two or three weeks later, however, McKenzie mentioned that the necessary funds were available.
 
 
 19
 Thereafter Hoffman met McKenzie and one Rusk (who was introduced as the representative of a title mortgage and discount company) at the airport in Charleston, West Virginia. Together they flew to Ontario, Canada in a twin-engine plane apparently furnished by McKenzie and Rusk. A John Walker met them at the Ontario airport and drove them to his farm to see his cattle. Walker had no relationship with NER or its predecessors. Hoffman inspected the cattle and said they looked "good to him." Walker said they would cost Hoffman $750 a head. They were "young heifers" and all good grade cows, Hoffman testified.
 
 
 20
 Hoffman himself pointed to the cows he wanted. Walker then shipped them by truck to Hoffman's farm in West Virginia, where they arrived in late April or early May. No document covering the transaction had been executed, Hoffman having agreed to sign after the cows were received. He testified that the animals delivered to him "was the cows I picked out," and that they were "good cows, except worn from the trip."
 
 
 21
 The lease, listing the cows, was presented by Rusk to Hoffman for signature on July 24. He signed it while baling hay in the field where, he says, he was unable to read it because he "didn't have his glasses." Rusk had earlier stopped by the Hoffman home, where Mary Hoffman signed the guarantee. She gave him the family check book to carry to her husband in the hayfield. Two checks were then on July 24, 1974 drawn and signed by Hoffman to pay two months' rental on the cows he had received in April. The checks were dated September 1st because Hoffman did not have enough money in the bank to meet them.
 
 
 22
 As noted already, both New York and Federal law approve in principle the contractual choice-of-forum and service-of-process clauses. Moreover, the law of both jurisdictions with regard to choice of forum is essentially the same. Cruise v. Castleton, Inc., 449 F.Supp. 564, 568-69 (S.D.N.Y.1978). Such an agreement must be "unaffected by fraud, undue influence, or overweening bargaining power." The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 12, 92 S.Ct. 1907, 1914, 32 L.Ed.2d 513 (1972). Degrading defects of this nature were wholly absent from the consummation of the contract in suit.
 
 
 23
 Hoffman contends that he was ignorant of the contract's provisions when he signed the lease. However, no one deterred him from getting his glasses and reading the contract, or from seeking desired explanation from Rusk or from his wife who had already signed. Ignorance due to failure to read is no excuse in New York, Amend v. Hurley, 293 N.Y. 587, 59 N.E.2d 416 (1944); Pimpinello v. Swift & Co., 253 N.Y. 159, 170 N.E. 530 (1930); Dambmann v. Schulting, 75 N.Y. 55 (1878), or in West Virginia, R. D. Johnson Milling Co. v. Read, 76 W.Va. 557, 85 S.E. 726 (1915); Acme Food Co. v. Older, 64 W.Va. 255, 61 S.E. 235 (1908).[3] No deception was present to dilute the rigor of this doctrine.
 
 
 24
 The Hoffmans also attack the contract as the result of overweening bargaining power. The fact that the forum and process clauses appear in a form contract used by a large corporation is not sufficient, however, to nullify the Hoffmans' consent. Hoffman was sufficiently important to be transported to Canada at no expense to himself. He hand-picked his cows, and was in possession for nearly three months before any instrument was presented for his signature. He already had complaints, which he voiced, before he signed. Clearly this was not a common "take-it-or-leave-it" form of contract.
 
 
 25
 For the errors of the trial court herein discussed, the judgment on appeal will be reversed and this action remanded to the District Court with directions to enter final judgment for the appellant, National Equipment Rental, Ltd., on its counterclaim.
 
 
 26
 Reversed and Remanded with Directions.
 
 
 
 [1]
 There were mesne assignors and assignees who were also sued by the plaintiffs, but the outcome of those suits is not in question here. For the purpose of this opinion we may treat NER as the immediate lessor
 
 
 [2]
 E. g., The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964); Gaskin v. Stumm Handel GmbH, 390 F.Supp. 361 (S.D.N.Y.1975); National Equipment Rental, Ltd. v. Centra Cast Co., 270 F.Supp. 999 (E.D.N.Y.1966); Gilbert v. Burnstine, 255 N.Y. 348, 174 N.E. 706 (1931); National Equipment Rental, Ltd. v. Dec-Wood Corp., 51 Misc.2d 999, 274 N.Y.S.2d 280 (App.Term.1966); National Equipment Rental, Ltd. v. Graphic Art Designers, Inc., 36 Misc.2d 442, 234 N.Y.S.2d 61 (Sup.Ct.1962). Of these, Centra Cast, Dec-Wood, and Graphic Art Designers involved provisions substantially similar to the clause in question here
 
 
 [3]
 Cf. Gaskin v. Stumm Handel GmbH., 390 F.Supp. 361, 365-67 (S.D.N.Y.1975) (enforcing choice-of-forum clause, written in German language, against a party ignorant of that tongue)