**KARLBERG EUROPEAN TANSPA, INC., Plaintiff,**

v.

**JK–JOSEF KRATZ VERTRIEBSGESELLSCHAFT MBH, Defendant.**

**No. 85 C 4605.**

United States District Court, N.D. Illinois, E.D.

Sept. 23, 1985.

George P. McAndrews, Charles W. Shifley, Gregory J. Vogler, Allegretti, Newitt, Witcoff & McAndrews, Ltd., Chicago, Ill., for plaintiff.

Detlef G. Lehnardt, Joseph P. Garland, Lehnardt & Miller, P.C., New York City, and Lawrence R. Levin, Wilson P. Funkhouser, Nancy R. Gamburd, Kenneth A. Grady, Levin & Funkhouser, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This case involves a contract dispute between Karlberg European Tanspa, Inc. (KETS), an American company in the business of selling tanning salon franchises and equipment, and JK-Josef Kratz Vertriebsgesellschaft mbH (JK), a German company which manufactures and sold KETS sun-tanning equipment. JK has moved to dismiss the action for improper venue under Rule 12(b)(3) of the Federal Rules of Civil Procedure.[1] For the following reasons, the court grants defendant's motion.

### I.

The relationship between KETS and JK started in 1982, when JK approached Ann and Stig Karlberg, sole owners of KETS, to establish an American distributorship of its products. After several negotiating sessions in the States, JK went back to Germany and drafted a contract. The contract, in German, was signed by the Karlbergs on November 8, 1982, even though neither Ann nor Stig Karlberg reads nor understands German. The contract was later translated into English by the Karlbergs. The 1982 contract contained a fo-

---

1. Defendant also moved to dismiss for improper service under Fed.R.Civ.P. 12(b)(5), but this is- sue is now moot and the court will not reconsider it.

rum selection clause and an applicable law clause which the Karlbergs now claim JK included in the contract without their knowledge.

In 1983, before the 1982 distributorship agreement ended, JK again contacted the Karlbergs to negotiate another agreement. Ann Karlberg met with JK officers Udo Sommerkamp and Walter Kratz in Germany in September 1983. They discussed trouble KETS had encountered with the Federal Drug Administration concerning safety requirements for the sun-tanning beds, quotas and sales forecasts for the upcoming year. JK's lawyers drafted a new agreement which Mr. Sommerkamp and Mr. Katz brought to the States in October 1983. After further negotiation, during which Ann Karlberg made requests for specific changes in the draft contract, the Germans returned to Germany and wrote the final draft. On November 19, 1983, Ann Karlberg signed this agreement which was in German, and on November 24, 1983, she signed an English version.

The current dispute is based on the 1983 distributorship agreement. The contract basically gives KETS exclusive distributorship in the United States of JK's Soltron products and a discount on any such products, in return for which KETS promised not to distribute any other manufacturer's sun-tanning products or sell other products to its franchisees. Numerous provisions cover responsibility for advertising, meeting safety regulations, and making repairs on the equipment, as well as terms of supply and inventory. While the core of the contract dispute is how these provisions were implemented over the course of the contract, they are irrelevant to the current motion.

Central to the current motion are the third and second-to-last provisions of the 1983 agreement, which state:

### Applicable Law

The laws of the Federal Republic of Germany are to be applied in interpretations of this contract. The German text is binding.

### Court of Venue

The courts exercising jurisdiction over the district in which JK is headquartered are responsible for hearing litigation in any and all disputes which may arise from this contract or the individual delivery agreements.

JK argues that these provisions clearly establish that the current contract dispute should be heard in West Germany. KETS argues that venue is proper in Illinois because the forum selection clause is ambiguous and that, even if it is read to name West Germany as the forum, its inclusion in the contract was the result of unequal bargaining power and its implementation would be grossly unreasonable given the circumstances of the two companies.

### II.

■ Before turning to the validity of the forum selection clause we address the issue of its interpretation. KETS argues that the clause is ambiguous because a person (specifically an unsophisticated business person, which Ann Karlberg claims to be) could interpret the phrase, "the district in which JK is headquartered," as meaning either JK's American or German offices. To show that JK had offices or headquarters in the United States, KETS submitted incorporation documents for JK subsidiary corporations, filed in Arizona. These documents fail to convince the court that the contract called for venue in the United States. First, the phrase, "JK is headquartered," plainly refers to JK-Joseph Kratz Vertriebsgesellschaft mbH, the party to the contract and the present defendant, not to JK International, Inc. or any other subsidiary corporation. Second, JK is an international corporation with headquarters in West Germany. Third, West German law controls. Finally, Arizona revoked JK International, Inc. and J.K. of Arizona, Inc.'s corporate status on September 18, 1983, for failure to file an annual report, and no evidence has been presented to show that these companies are or were substantial operating entities during the contract period. From all these

indications the court has concluded that the forum selection clause contained in the 1983 Agreement refers all contract disputes to West Germany.[2]

■ Forum selection clauses are presumptively valid unless the party opposing the clause can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, — U.S. —, 105 S.Ct. 3346, 87 L.Ed.2d 444, Trade Reg.Rep. (CCH) par. 66,669 (U.S.1985); *Snyder v. Smith*, 736 F.2d 409 (7th Cir. 1984); *Coastal Steel Corporation v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190 (3d Cir.1983); *Hoes of America, Inc. v. Hoes*, 493 F.Supp. 1205 (C.D.Ill.1979); *Gaskin v. Stumm Handel GmbH*, 390 F.Supp. 361 (S.D.N.Y.1975). The "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes" strongly favor enforcement of forum selection clauses in international contracts. *Mitsubishi, supra*, — U.S. at —, 105 S.Ct. at 3355, Trade Reg.Rep. (CCH) at 63,149; *see also In Re Oil Spill by Amoco Cadiz*, 659 F.2d 789, 795 (7th Cir.1981) ("special deference [is] owed to forum-selection clauses in international contracts").

■ KETS has a heavy burden of proving that despite the *prima facie* validity of the clause in the 1983 Agreement, its enforcement should be denied. KETS must show that the contract was invalid due to fraud or overreaching, or that the contractual forum would be "so gravely difficult and inconvenient that [KETS] will for all practical purposes be deprived of [its] day in court." *Bremen*, 407 U.S. at 18, 92 S.Ct.

at 1917; *Coastal Steel Corporation*, 709 F.2d at 202.

Turning to the validity of the contract, KETS argues that the contract is invalid for several reasons. KETS insists that it is a small, unsophisticated "mom and pop" operation that was no match in negotiations with JK, and that JK took advantage of its bargaining position to write in the forum selection clause. The court disagrees with KETS' self-description. At the time of the 1983 Agreement KETS sales were in excess of $2,500,000, and it had 170 franchisees. KETS projected 302 franchisees in 48 states by 1984. In this very contract action, KETS is demanding at least $20,000,000 in damages. KETS is by no means a small local business.

■ KETS claims it is unsophisticated compared to JK, in that Ann Karlberg did not have a lawyer involved in the negotiations or the signing of the 1983 Agreement, and without a legal expert to advise her she simply did not read or notice the forum selection clause. She also claims that the clause was never discussed in any of the meetings between KETS and JK. We find these arguments unpersuasive for several reasons. First, basic contract law establishes a duty to read the contract which the Karlbergs cannot escape. *See* Calamari & Perillo, *Law of Contracts*, secs. 9–42 to 9–46 (2d Ed.1977); *Hoffman v. National Equipment Rental, Ltd.*, 643 F.2d 987, 991 (4th Cir.1981); *Gaskin v. Stumm Handel GmbH*, 390 F.Supp. at 366–367 (duty to read upheld even when contract written in German, a language the party could not read or understand).

The contract involved was not a form contract or a contract of adhesion, but rather one freely negotiated between business people. Ann Karlberg had a chance to review the proposed terms and she recommended changes in the draft that were incorporated into the final agreement. The

---

**2.** The parties have not addressed the precise issue of whether, under German law, such forum selection clauses are valid. However, in a similar case in which this issue was litigated, Judge Ackerman found that "German courts and legislation would allow the parties" to agree to choice of law and forum provisions. *Hoes of America, Inc. v. Hoes*, 493 F.Supp. 1205, 1208 (C.D.Ill.1979). We will assume for purposes of this motion that Judge Ackerman is correct.

forum selection clause in the final agreement was clearly visible to its signers, being the longest of three provisions on the last page of the agreement, above where the parties signed. *See The Bremen,* 407 U.S. at 13 n. 14, 92 S.Ct. at 1914 n. 14 ("The forum clause could hardly be ignored.") Given these facts, KETS' arguments that it did not negotiate or discuss the forum selection clause and that it was not explained to Ann Karlberg do not "rise to the level of fraud, overreaching, or unconscionability." *Richardson Greenshields Securities v. Metz,* 566 F.Supp. 131, 133 (S.D.N.Y.1983).

The cases KETS cites as support for its "contract of adhesion" theory involved significantly different facts. They all involved form contracts with the forum selection clause buried in boilerplate language in fine print. *Colonial Leasing Co. of New England v. Pugh Bros. Garage,* 735 F.2d 380 (9th Cir.1984); *Couch v. First Guaranty Limited,* 578 F.Supp. 331 (N.D.Tex. 1984); *G.H. Miller & Co. v. Hanes,* 566 F.Supp. 305 (N.D.Ill.1983); *Cutter v. Scott & Fetzer Co.,* 510 F.Supp. 905 (E.D.Wisc. 1981). These cases recognize a qualitative difference between form contracts and freely negotiated contracts specifically tailored by the parties to address their concerns. *See e.g., Couch, supra,* at 333 ("justice requires that a distinction be drawn between freely negotiated contracts and standard form contracts"); *see also* Calamari & Perillo, *Law of Contracts,* sec. 9–44 (1977), ("There has been a tendency ... to treat contracts of adhesion or standard form contracts differently from other contracts. This is particularly true with respect to the duty to read.").

■ KETS also argues that, even if the forum selection clause is valid, its enforcement would be so unreasonable as to deprive it of its "day in court." *The Bremen,* 407 U.S. at 18, 92 S.Ct. at 1917. First, it should be noted that this language in *The Bremen* cannot be interpreted to mean that the party opposing the forum selection clause has a right to the same judicial process in the imposed forum that it would have in its chosen forum. This interpreta-

tion would make a mockery of the policy behind enforcing these clauses. Thus, the court should only ensure that the opposing party will be treated fairly and have an adequate chance of presenting his case. *See Hoes of America, Inc. v. Hoes,* 493 F.Supp. at 1209.

■ KETS argues that litigating in West Germany is unreasonable because most of its witnesses are here, the defective tanning equipment is here, many documents are in English, and discovery is much more limited under the West German court system than it is here. The court finds that none of these factors rise to the level of unreasonableness that would deprive KETS of its day in court. While KETS' witnesses are here, the $20,000,000 damages KETS seeks surely justifies the expense of traveling to West Germany. *See Zima Corp. v. M.V. Roman Pazinski,* 493 F.Supp. 268 (S.D.N.Y.1980); *Central Contracting Co. v. Maryland Casualty Co.,* 367 F.2d 341 (3d Cir.1966); *Gaskin v. Stumm Handel GmbH,* 390 F.Supp. at 369. Much of the evidence seems to be in the form of franchisees' complaints regarding the quality of the equipment. These complaints were recorded by KETS' office personnel, so live witnesses will not be essential. Further, most of the communication between KETS and JK was done through Telex, again producing documents that can be introduced into evidence. These documents, although in English, are easily translated into German.

■ Discovery, especially the taking of depositions, is much more limited in West Germany than in the States. *See* Shemanski, *Obtaining Evidence in the Federal Republic of Germany: The Impact of the Hague Evidence Convention on German-American Judicial Cooperation,* 17 Int'l Lawyer 465 (1981). This may make gathering evidence on JK's manufacturing process and safety precautions difficult. However, this evidence goes more to KETS tort claims of breach of implied warranty of merchantability and breach of implied warranty of fitness for a particular purpose, and are not central to the dispute.

How these tort claims will fare under German law is unclear,[3] but it is not this court's role to guarantee KETS the same probability of success on all its claims. More importantly, KETS, by signing the contract, agreed to trial in Germany under German law, and *The Bremen* makes clear that the court must enforce such agreements. *See Hoes of America, Inc. v. Hoes,* 493 F.Supp. at 1209; *Central Contracting Co. v. Maryland Casualty Co.,* 367 F.2d at 344 (it may be assumed that the plaintiff received consideration for the inconvenience of litigating in a foreign forum).

KETS relies heavily on the reasoning in *Copperweld Steel Co. v. Demag-Mannesmann-Bohler,* 578 F.2d 953 (3d Cir.1978), but the court finds the case nondispositive. In that case, the German designer maintained its own offices in the United States, and the equipment in dispute was made and operated in this country.[4] The court was faced with a dispute that was overwhelmingly domestic in nature. The situation before this court has a much stronger international flavor. Litigating international disputes is always going to be inconvenient for one (or both) of the parties, and we find that the parties allocated this burden in a contract that the court is in no position now to modify.

KETS makes one final argument in an attempt to avoid the forum selection clause, namely that its enforcement would contravene Illinois' strong public policy of regulating franchisor/franchisee relationships. *See* Ill.Rev.Stat. ch. 121½, § 701 *et seq.* (1984); *ECC Computer Centers of Illinois, Inc. v. Entre Computer Centers, Inc.,* 597 F.Supp. 1182 (N.D.Ill.1984). Even if Illinois law has, for that narrow purpose, a role in the relationship between the parties, there is a problem with this argument: the current dispute is not between franchisor and franchisee, but rather between a distributor and its supplier. The fact that this dispute affects the relationship between KETS and its franchisees is not enough to vitiate the strong policy in favor of forum selection clauses in freely negotiated international contracts.

One last issue raised by KETS needs to be addressed. KETS argues that it should be allowed to continue discovery because we have exercised *in personam* jurisdiction over JK, citing *Greco v. Kremlin, Inc.,* 101 F.R.D. 503 (N.D.Ill.1984) and *In Re Anschuetz & Co., GmbH,* 754 F.2d 602 (5th Cir.1985). The court implicitly recognized KETS' right to discovery while it decided JK's motion to dismiss by allowing KETS to serve JK with interrogatories. However, in the cases cited by KETS the American court retained jurisdiction and the issue was whether American or foreign discovery rules should apply when one of the litigants is from a country which is a party to the Hague Convention. This issue is not present here, as the court, in dismissing KETS' action, is giving up all jurisdiction in the case. *See Gaskin,* 390 F.Supp. at 370; *Sanko Steamship Co., Ltd. v. Newfoundland Refining Co., Limited,* 411 F.Supp. 285, 286 (S.D.N.Y.), *cert. denied,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 136 (1976); *cf. Wright & Cooper, Federal Prac-*

---

**3.** KETS has argued that if the forum selection clause is enforced it extends only to the contract claims. However, the court finds that KETS' tort claims "arise from the contract" and, as the court in *Hoes of America, Inc. v. Hoes* stated, "German courts and legislation would allow the parties to [agree to an all-encompassing choice of law and choice of forum provisions] even as to business torts...." 493 F.Supp. at 1208.

**4.** Other factors considered by the court were: (1) that the facility which was the subject of the action was located in Warren, Ohio and was likely to become the object of an intensive inspection during the trial;

\* \* \* \* \* \*

(3) that all of the records concerning operation of the plaint were in this country; (4) that all of Copperweld's personnel who operated the plant were in this country; (5) that all of Copperweld's personnel who negotiated the contract were in this country;

\* \* \* \* \* \*

(7) that practically all of the activities undertaken in connection with the contract took place in the English language; (8) that almost all of the witnesses were English speaking; and (9) that conducting the litigation in Germany would have required translation with inherent inaccuracies.

*Copperweld Steel Co.,* 578 F.2d at 965 n. 8.

tice and Procedure: Jurisdiction, sec. 3846 (1976) (a court loses all jurisdiction when it transfers a case under 28 U.S.C.A. § 1404(a) ). Consequently, the court is now powerless to order discovery in the case, and KETS will have to bring its requests to a West German tribunal if it pursues this action in court.

### Conclusion

Because we find that the parties entered into a valid contract whose forum selection clause covers the present dispute, we dismiss for improper venue.