**ROUSE WOODSTOCK, INC., Plaintiff,**

v.

**SURETY FEDERAL SAVINGS & LOAN ASSOCIATION, Defendant.**

**No. 84 C 3011.**

United States District Court, N.D. Illinois, E.D.

March 18, 1986.

James E. Beckley, Beckley & Associates, Chicago, Ill., Michael O. Finkelstein, Barrett, Smith, Shapiro, Simon, & Armstrong, New York City, for plaintiff.

James D. Ossyra, Hopkins & Sutter, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Defendant moves to transfer this case to the Western District of North Carolina. Plaintiff Rouse Woodstock, Inc. (Rouse), a Chicago commodity futures commission merchant, brought this action to recover an unpaid balance of $84,148.29 in the account of defendant Surety Federal Savings & Loan Association (Surety) of Morganton, North Carolina. Surety, however, has counterclaimed for $9,000,000, the approximate amount of its losses in commodities trading with Rouse. It also has filed an action in the federal court for the Western District of North Carolina against Rouse and three other commodity merchants seeking a total of $14,000,000. From the beginning venue for this case has been a troublesome question. This court denied one motion by Surety to transfer venue, but expressly gave it leave to renew the motion after further developments. The develop-ments have now taken place and the motion is renewed, but the question is no less troublesome.

## BACKGROUND

The underlying facts in this case are complex. Surety, like many other financial institutions, found itself in the early 1980s on the wrong side of changing interest rates and attempted to improve its posture through commodities trading. Though the idea to try commodities apparently first came from Surety's president, Billy Davis, the actual trading was left in the hands of Rickey Reynolds, who joined Surety in November of 1981 and rose to vice-president. Like some other financial institutions, Surety's strategies in the commodities market left it worse off than before. By early 1983 it had three accounts with three different merchants, each separately approved by the board of directors, each opened apparently out of dissatisfaction with the preceding merchant.

At that point, probably in March 1983, Joseph Pentecoste, an agent for Rouse, contacted Reynolds to offer his services. According to Reynolds' deposition, from the outset he told Pentecoste that the purpose of the new Rouse account would be speculation, in the hope of gaining enough to cover the losses from previous trading. Federal regulations allow savings and loan associations to hedge but not to speculate. According to Surety, its board had resolved to cease all commodities trading on March 31, 1983. Reynolds nevertheless caused an account in Surety's name to be opened with Rouse apparently in early April. He admits that he forged the signatures of both Davis and Surety's secretary, Charles Henson, to the account documents. He also secretly removed the corporate seal from Henson's desk and stamped one document with it. The papers were drawn up for a hedging account, but no one seriously disputes that the account was traded speculatively.

Trades for the account were normally ordered through telephone conversations

between Reynolds in Morganton and Pentecoste in Chicago, and effected through the Chicago Board of Trade. At one point, Rouse maintains, its then president, Arthur Hahn, noted the size of the account and learned that the documents for it could not be located in Rouse's files. He called Davis to verify the account's status. Davis does not remember the call, but according to Reynolds Davis merely referred the call to him. A new set of documents was sent to Davis for corporate approval, but again according to Reynolds Davis merely passed them on to him. Reynolds again forged the signatures, secretly applied the corporate seal and returned the documents to Rouse. At another point Louis Skydell, a Rouse executive, visited Surety. Davis was on vacation but Reynolds arranged a brief meeting with Henson. Reynolds admits making misleading remarks to Henson so that Henson would respond to Skydell in a manner which would not arouse suspicion.

Trading continued unchecked until mid-November 1983, when the association's auditors uncovered the size of the losses. Reynolds resigned. The United States Attorney's office for the Western District of North Carolina launched an investigation, grounded in part on tapes Rouse had made of conversations between Reynolds and Pentecoste, which led to the indictment of both. Pentecoste gave evidence to the U.S. Attorney, pled guilty to one count of conspiracy to divert funds from Surety and was sentenced to three years probation and a $10,000 fine. Reynolds pled guilty to one count of falsifying documents going to a federal agency and one count of conspiracy. He is now serving a five-year sentence at the federal prison in Big Springs, Texas.

Surety claims overall losses from Reynolds' commodity trading of some $14,000,-000, which has left it virtually without funds. It believes that all the futures commission merchants with whom it dealt bear responsibility for those losses. In its suit in North Carolina it seeks recovery from all four merchants through three counts: a breach of the merchant's duty of care to-

ward customers under the Commodities Exchange Act, failure to supervise their agents and associated persons as required by the same Act, and breach of a common law duty of care. A fourth count is directed only at Rouse, asserting that Rouse either knew or should have known from the outset that its account in Surety's name was unauthorized. Its counterclaims against Rouse here are virtually identical to its claims against Rouse there. By agreement between the parties and the North Carolina court, if the motion to transfer is denied Rouse will be dropped from that action.

This court previously determined that this case potentially could be transferred to the Western District of North Carolina since the action could have been brought there. It also noted the existence of a clause in the account documents consenting to Chicago as the forum and venue for any suits over the account. Because of the circumstances surrounding the opening of the account, Surety disputes the enforceability of that clause. We noted the dispute but did not decide the question.

We did, however, reject Surety's argument that giving weight to the plaintiff's choice of forum in a case where the counterclaim appears to be the larger claim was allowing the tail to wag the dog. We held that since Rouse is headquartered here, and the forum had a real connection to the suit since the trades were performed here, the plaintiff's choice of forum was entitled to the usual weight given in transfer cases. We found the factors favoring North Carolina as a location for the suit to be about evenly balanced by the factors favoring Illinois. Since transfer is only granted when a defendant shows a clear balance favoring it, we denied transfer. *Rouse Woodstock, Inc. v. Surety Federal Savings & Loan Association*, No. 84 C 3011, slip op. (N.D.Ill. Feb. 5, 1985).

## DISCUSSION

On a motion to transfer venue under 28 U.S.C. § 1404(a) the statute directs us to

consider the convenience of the parties, the convenience of witnesses and the interests of justice. The principal issue here under convenience of the parties is whether the forum selection clause is valid, thereby blocking Surety from asserting its own inconvenience. There are important witnesses both here and in North Carolina, although the scale probably tips towards Chicago since Pentecoste is here. The interests of justice, on the other hand, may favor North Carolina somewhat. A related action is pending there and the tapes and transcripts used in the grand jury investigation are still in the custody of the United States Attorney in Asheville. No factor stands out as obviously decisive.

## I. The Venue Selection Clause

Federal courts usually enforce contractual provisions which stipulate a choice of forum or venue for controversies arising under the contract. *Burger King Corp. v. Rudzewicz*, 471 U.S. ——, —— n. 14, 105 S.Ct. 2174, 2182 n. 14, 85 L.Ed.2d 528 (1985). A clause in Rouse's documents for the Surety account says that "any judicial ... proceeding in any way arising out of or related to this Agreement ... will, at Rouse Woodstock's option, take place in Chicago, Illinois." The clause further provides that if the action could have been brought in Surety's home district, and Surety prevails, Rouse will pay Surety's transportation cost to Chicago. Rouse urges the enforcement of this clause to defeat the transfer motion.

■ This court notes at the outset, however, that even if such a clause is valid and enforceable, we are not bound by it for purposes of a transfer motion. The question of a proper venue for a suit is a question of federal law which takes priority over private contractual rights. The decision on whether or not to enforce the clause can therefore only be made as part of an overall consideration of factors relating to venue. *Benge v. Software Galeria, Inc.*, 608 F.Supp. 601, 606 (E.D.Mo.1985). *See also D'Antuono v. CCH Computax Systems, Inc.*, 570 F.Supp. 708, 711 (D.R.I.

1983); *Hoffman v. Burroughs Corp.*, 571 F.Supp. 545, 548 (N.D.Tex.1982). A venue selection clause therefore does not of itself prevent transfer out of the venue which the clause directs. A court still must weigh the factors as Congress has directed it in § 1404(a). *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 757–758 (3d Cir.1973); *Meineke Discount Muffler Shops, Inc. v. Feldman*, 480 F.Supp. 1307, 1310 (S.D.Tex. 1979).

■ Most courts conclude, therefore, that a valid forum or venue selection clause at most affects only consideration of the convenience of the parties. *Plum Tree*, 488 F.2d at 758. Section 1404(a) requires an evaluation of the convenience of witnesses and the interests of justice as well as the parties' convenience. Typically, a valid venue clause is treated as a defendant's waiver of his right to assert his own inconvenience on a motion to transfer. It does not prevent his raising questions of witness convenience or justice. *Id.* at 758 n. 7; *D'Antuono*, 570 F.Supp. at 710, 713; *Meineke*, 480 F.Supp. at 1310.

■ A court may therefore choose not to enforce a venue clause if enforcement seems unjust. Such a clause will not, for example, prevent transfer where the place of venue has no material connection with the operative facts of the lawsuit. *Walter E. Heller & Co. v. James Godbe Co.*, 601 F.Supp. 319, 321 (N.D.Ill.1984); *Essex Crane Rental Corp. v. Vic Kirsch Construction Co.*, 486 F.Supp. 529, 537–539 (S.D.N.Y.1980). Surety has asserted from the outset that because Reynolds' acts occurred in North Carolina the lawsuit belongs there. It is true that ideally, in a case involving fraud, one seeks to place venue at the "nerve center" of the alleged fraud. *Oil & Gas Ventures—First 1958 Fund, Ltd. v. Kung*, 250 F.Supp. 744, 755 (S.D.N.Y.1966). But this case does not have an obvious center. The fraud, if fraud there was, occurred in both Chicago and Morganton, and especially on the phone lines between them, as Reynolds and Pentecoste discussed commodities trading.

The clause is, however, part of a stan-dard form contract which Rouse wrote. Such "boilerplate" clauses require that a court carefully examine the equities involved, both in the process of contracting and in enforcement. *Kline v. Kawai America Corp.*, 498 F.Supp. 868, 872 (D.Minn.1980). Many courts are reluctant to enforce such clauses when the record shows great disparity in bargaining power and gives no indication that the clause was separately bargained for. *Cutter v. Scott & Fetzer Co.*, 510 F.Supp. 905, 908 (E.D. Wis.1981). As between a commodities merchant and a savings and loan, this court sees no great disparity in bargaining power at the time the account was opened. However, on a transfer motion a court may normally consider the financial status of the defendant to determine whether litigation in a distant forum would be a severe hardship. *Butterick Co. v. Will*, 316 F.2d 111 (7th Cir.1963); *Bolton v. Tesoro Petroleum Corp.*, 549 F.Supp. 1312, 1314 (E.D. Pa.1982). At least one court has suggested that a venue clause does not mean that the defendant has waived consideration of that factor. *Aamco Automatic Transmissions, Inc. v. Bosemer*, 374 F.Supp. 754, 757 (E.D.Pa.1974). We are inclined to agree. Surety is now in a far different financial state than when it began trading with Rouse and a transfer would ease its burden to some extent. On the other hand, disparities in financial status are not necessarily decisive. In *Richardson Greenshields Securities, Inc. v. Metz*, 566 F.Supp. 131 (S.D.N.Y.1983), a futures commission merchant filed suit in New York against an individual customer who resided in Maryland on the same ground that Rouse alleges here: failure to pay deficits incurred in trading. The account contract contained a venue selection clause which directed New York as the forum for any litigation. In spite of the boilerplate nature of the clause, and substantial differences in financial status, the court nevertheless enforced the clause because the forum had a reasonable relation to the suit.

■ A venue selection clause also is not enforceable if it was obtained by fraud.

*The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972); *Plum Tree*, 488 F.2d at 757 n. 5. Surety naturally argues that the fraudulent circumstances surrounding the opening of the Rouse account make the clause in the case at bar unenforceable. That argument, however, is not as decisive as it seems at first glance. The Supreme Court, in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), a case involving international commerce and an arbitration clause, commented that fraud in the transaction generally should not be enough to invalidate such a clause. The party challenging the clause needs to show that the arbitration clause itself was obtained by fraud. 417 U.S. at 519 n. 14, 94 S.Ct. at 2457 n. 14.

■ Though *Scherk* involved an international agreement, which normally is given special deference, *see Karlberg European Tanspa, Inc. v. JK–Josef Kratz Vertriebsgesellschaft*, 618 F.Supp. 344, 347 (N.D.Ill.1985) and *Clinton v. Janger*, 583 F.Supp. 284, 288 (N.D.Ill.1984), and also construed a different kind of clause, courts have applied the same principle to challenges directed at domestic forum and venue selection clauses. The movant must show not merely a fraudulent transaction but fraud which goes to the selection of venue. *Benge*, 608 F.Supp. at 607; *D'Antuono*, 570 F.Supp. at 715; *Hoffman*, 571 F.Supp. at 548; *Furry v. First National Monetary Corp.*, 602 F.Supp. 6, 9 (W.D. Okla.1984). *But see General Engineering Corp. v. Martin Marietta Alumina, Inc.*, 783 F.2d 352 (3d Cir.1986) (*Bremen-Scherk* standard not necessarily applicable to domestic cases). Surety does not cite and this court has not found a case in which a movant has met that burden. If Surety had opened an account with Rouse under normal circumstances, as it did with three other commodities merchants, the boilerplate would have been in the contract. Odds are that it would have signed. And whatever Pentecoste may have said or done, there is no evidence that he expressly

sought to induce selection of a particular venue.

It is possible, however, to approach the question of the effect of the possible fraud on the venue clause from a different angle. As Surety points out, Rouse seeks to bind Surety, a corporation, through the acts of Reynolds, who was merely an agent of that corporation. Fraud which would undercut Reynolds' authority to bind the corporation would presumably void every clause in the contract, including the venue selection clause. *See generally Evanston Bank v. ContiCommodity Services, Inc.*, 623 F.Supp. 1014 (N.D.Ill.1985).

■ The authority of any agent, whether express or implied, inherent or apparent, must stem from the words or actions of his principal. If the principal is a corporation, that means that the agent's authority must be traceable, directly or indirectly, to the corporation's board of directors. *Chase v. Consolidated Foods Corp.*, 744 F.2d 566, 568–569 (7th Cir.1984); 2 Fletcher, Cyclopedia of the Law of Private Corporations, §§ 434, 444, 483.1 (1982). A party dealing with a purported agent of a corporation is obliged to take some steps to verify that the individual is in fact an agent of the corporation and that the transaction is within the scope of the authority which the corporation's board of directors has granted that agent. *Malcak v. Westchester Park District*, 754 F.2d 239, 245 (7th Cir.1985). The party may rely on indications of authority, but the reliance must be reasonable under the circumstances. *Moreau v. James River-Otis, Inc.*, 767 F.2d 6, 9 (1st Cir.1985). If the party knows or has reason to know that the agent is in fact exceeding his authority, is acting in his own interests and adversely to his principal, then reliance is not reasonable and the principal is not bound. *Chase*, 744 F.2d at 569; *Fustok v. Conticommodity Services, Inc.*, 577 F.Supp. 852, 858 (S.D.N.Y.1984), *complaint dismissed on other grounds*, 610 F.Supp. 986 (S.D.N.Y.1985). *See generally* 1 Restatement of the Law of Agency 2d, §§ 165, 166 (1958).

■ Rouse argues that since Reynolds was a corporate officer, and the officer who handled commodities trading for Surety, it was entitled to assume that he had the authority to open new accounts. The authority to bind Surety to a venue selection clause would then be implied as incidental to that authority. The question, however, is not that simple. The corporate officer who has broad inherent authority to bind a corporation is its president. Reynolds was a vice-president. Corporate vice-presidents are merely conditional officers who act as president in the case of the latter's absence, incapacity or death. Absent indications of one of those circumstances, a vice-president has no inherent authority and can bind the corporation only on matters for which the directors or the by-laws have actually granted him authority. 2A Fletcher, Cyclopedia, § 627 (1982).

If a vice-president is entrusted with a portion of the firm's activities then he may indeed bind the corporation within the scope of his apparent authority over that portion. *Id.* However, the fact that Reynolds was entrusted with the management of existing commodities accounts does not necessarily mean that he also had apparent authority to open new accounts. Indeed, Surety's practice had been to require board approval for new accounts, and one suspects that its practice was not unique. Whether Rouse was entitled to rely on the appearance of his authority is at the very least a question which a trier of fact should resolve after an evidentiary hearing. *See, e.g., Borg-Warner Leasing v. Doyle Electric Co.*, 733 F.2d 833, 836 (11th Cir.1984).

■ Rouse also contends that it could rely on the documents which Reynolds sent, which appeared to be in order, complete with purported signatures of officers and the corporate seal. It is true that as a general rule innocent third parties who rely on apparently valid indications of authority should not bear the loss stemming from the acts of a faithless agent. A principal who places an agent in a position of authority normally must accept the consequences when that agent abuses that au-

thority. *First National Bank of Cicero v. United States*, 625 F.Supp. 926, 933–934 (N.D.Ill.1986). The operative word in the doctrine, however, is "innocent." If the party knows or has reason to know that the agent is faithless, the right to rely vanishes. *Evanston Bank*, 623 F.Supp. at 1032; *Fustok*, 577 F.Supp. at 858.

By the usual principles of agency law, whatever Pentecoste knew would probably be imputed to Rouse. Pentecoste was Rouse's agent and customers were within the scope of his authority. Rouse also has retained the benefits, namely the commission fees, of a transaction which Pentecoste secured for it. *See Cicero*, 625 F.Supp. at 931–932; 3 Fletcher, Cyclopedia, §§ 819, 827 (1975). Reynolds says that he told Pentecoste that the account was intended for speculative trading. Since savings and loan associations are not supposed to speculate, the request would appear to be outside the usual course of the firm's business. Not even a corporate president, let alone a vice-president, has inherent or apparent authority to bind a corporation outside the usual course of its business. 2A Fletcher, Cyclopedia, § 627. Further, that request alone, since it jeopardized Surety's status with federal agencies, could have been enough to put Pentecoste on notice that Reynolds was either exceeding his authority or acting adversely to his principal. If so, Rouse would have been obliged to take extra care to investigate the situation in order to bind Surety. *Evanston Bank*, 623 F.Supp. at 1032–1033. If Pentecoste actually knew that Reynolds was opening the account without board approval—a possibility which, given Pentecoste's guilty plea, cannot be excluded at this stage— then Rouse, of course, had even less right to rely.

■ Much the same applies to Rouse's other arguments. It offers a resolution by Surety's board from September 1981 (before Reynolds joined Surety), which could perhaps be construed as a general grant of authority to vice-presidents to "establish" commodities accounts. However, there is no indication that Rouse knew of the resolution until discovery for this suit and so Rouse could not have relied on it. Rouse also argues that Davis' handling of both the phone call from Hahn and the second set of account documents worked a ratification by estoppel which bound Surety to the venue clause. Ratification may indeed be implied by a failure to repudiate an unauthorized transaction. However, ratification may be inferred from silence only when a principal has full knowledge of all material facts. *Evanston Bank*, 623 F.Supp. at 1034. Here, Reynolds actively concealed knowledge of the account from Davis and the directors, although Davis also seems to have made little effort to learn. Further, ratification by estoppel protects only innocent third parties, not parties who share responsibility for the loss. *Old Security Life Insurance Co. v. Continental Illinois National Bank*, 740 F.2d 1384, 1392 (7th Cir.1984); *Evanston Bank*, 623 F.Supp. at 1034, 1037. Pentecoste's guilty plea to conspiracy charges rather strongly suggests that he, and through imputation Rouse, was not innocent. If Pentecoste either knew of Reynolds' secrecy or was an active participant in a fraudulent scheme, then Rouse can no more rely on an apparent ratification than on any other indication of authority.

■ In short, the validity of the venue selection clause cannot be determined without a decision on, for example, how much Pentecoste knew or should have known versus how much Davis and the board knew or should have known. These are factual questions which will have major determinative effect on the claim itself. An evidentiary hearing on such potentially outcome-determinative questions seems inappropriate merely to place venue. There are enough questions about the validity of the clause to make its strict enforcement inequitable. This court therefore declines to give the venue selection clause significant weight in its consideration of the motion to transfer.

Following on that determination, we conclude that Surety has not waived its right to assert its own inconvenience. Surety is

domiciled in North Carolina and that is a factor which can be considered on a transfer motion. *CFTC v. First National Monetary Corp.*, 565 F.Supp. 30, 32 (N.D.Ill. 1983). Litigating at a distance imposes an additional expense, which is a hardship in its current financial state. *Bolton*, 549 F.Supp. at 1314. Litigation in a distant forum would seem less of a hardship to Rouse, a nationally active commodities merchant. *Cf. Butterick*, 316 F.2d at 112.

However, as a practical matter, Surety's motion does not seek merely to move this suit, but rather to incorporate these claims into its lawsuit in North Carolina. That action has three more parties and involves a host of additional trades not covered by the instant case. Rouse would become but one defendant in a much larger action. Given the need to establish the specifics of trades with four different merchants, one would expect that case to require a far lengthier trial as well. Seen in that light, transfer would work a hardship on Rouse at least equivalent to the burden placed on Surety by litigating here. Rouse originally brought an action of limited scope. Its interest in that scope, as well as its choice of forum, is entitled to some consideration. All of these factors go on the scale for weighing.

## II. Witnesses

The question of the convenience of witnesses in a venue transfer motion is not entirely separable from the question of the interests of justice. A trial without essential witnesses is less likely to yield a just result, although modern methods of discovery such as videotape depositions have significantly mitigated the likelihood of imbalances. In general, however, one hopes for live testimony from those who witnessed the factual occurrences from which the lawsuit arises. *Harris Trust & Savings Bank v. SLT Warehouse Co.*, 605 F.Supp. 225, 228–229 (N.D.Ill.1985). This concern takes on even greater importance in a case involving fraud, where the result may turn on the trier of fact's evaluation of the credibility of the witnesses. The

presence of those persons charged with fraud and others who can testify directly about fraudulent conduct may be crucial to the outcome. *Kung*, 250 F.Supp. at 755–756; *McCrystal v. Barnwell County*, 422 F.Supp. 219, 223–224 (S.D.N.Y.1976).

In a prior ruling in the case at bar, therefore, we were most concerned about the appearance of Reynolds. He, however, imprisoned in Texas, is now readily available to neither forum. Following the same logic, however, live testimony from Pentecoste is a major consideration. Pentecoste is no longer a Rouse employee, but he still resides in the Chicago area. He is thus subject to compulsory process here. Rouse has also listed seven other residents of this district no longer employed by it whose testimony would be helpful, including Hahn and Skydell. Surety emphasizes the value of the testimony of certain North Carolina residents such as Davis and Surety's directors, who can testify to their knowledge of Reynolds' activities. Such testimony will indeed be important but it does not seem as crucial as Pentecoste's. There also is a greater likelihood that these persons will testify voluntarily, even at a distance. On the question of witnesses the balance significantly favors Chicago.

## III. Other Factors

■■■ Of the remaining factors to be considered in the interests of justice, the one which stands out is the existence of a pending related action in the North Carolina federal court. The potential for bringing actions together under the umbrella of a single district is entitled to considerable weight in a transfer motion if transfer would lead to consolidation of discovery. *A.J. Industries, Inc. v. United States District Court*, 503 F.2d 384, 389 (9th Cir. 1974); *S.E.C. v. First National Finance Corp.*, 392 F.Supp. 239, 242 (N.D.Ill.1975). There seems little doubt that some discovery could be consolidated if the case at bar were transferred. The weight given to a pending action increases when, as here, the transferee district already has under its jurisdiction documents and other evidence

of considerable importance to the case, *S.E.C.*, 392 F.Supp. at 242, and when, as here, an investigation by law enforcement officials into matters related to the claims is in progress, *Waites v. First Energy Leasing Corp.*, 605 F.Supp. 219, 223 (N.D. Ill.1985).

The interests of judicial administration would unquestionably be well served by transfer of this case. With transfer would come the likelihood of one discovery process rather than two, one set of pretrial motions rather than two, and, most importantly, one trial rather than two. Transfer also would similarly save Surety some energy and expense. It would need to present its evidence on its own internal operations and the general way it handled relations with commodities merchants once rather than twice. A significant amount of judicial and legal time and energy could be saved if this suit were in Asheville or Charlotte.

However, the weight given to a pending action decreases when, as here, that action was not the first one filed. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978), *cert. denied* 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). The argument for transfer also loses some of its force if the pending action includes different parties and different issues. *Hammond Corp. v. General Electric Credit Corp.*, 374 F.Supp. 1356, 1360 (N.D.Ill. 1974). If the suit in the transferee court covers a broader area than the action in the transferor court, including additional facts not involved in the latter action, then bringing the cases together under one judicial roof is less important. *Gregg Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 575 F.Supp. 1269, 1270 (N.D.Ill.1984); *Polychrome Corp. v. Minnesota Mining and Manufacturing Co.*, 259 F.Supp. 330, 333–334 (S.D.N.Y. 1966). What is most important to an evaluation for purposes of transfer is the extent to which the claims in the two actions rest on a common factual foundation. The most compelling argument for transfer arises when the outcome of each claim in both actions hinges on the determination of

a single set of facts. *See, e.g., Berg v. First American Bankshares, Inc.*, 576 F.Supp. 1239, 1243 (S.D.N.Y.1983); *Sundance Leasing Co. v. Bingham*, 503 F.Supp. 139 (N.D.Tex.1980); *Kisko v. Penn Central Transportation Co.*, 408 F.Supp. 984 (M.D.Pa.1976).

The instant motion does not present such a compelling case. Surety emphasizes the factual questions common to the actions: what Reynolds, as the "moving force" behind all the commodities transactions, knew and did; the degree of knowledge of his activities, or lack of it, on the part of Surety's officers and directors. Certainly there are common facts, but the greater similarities between the actions are in the legal theories of recovery, not the factual base. The common theme is allegedly unauthorized commodities trading which consumed Surety's resources. The North Carolina action, however, includes three additional merchants. Moreover, Surety admits that it authorized at least the existence of its accounts with those three merchants. The claim against Rouse rests in part on a different factual base. The complaint itself reflects the difference, since Surety maintains in a separate count directed only at Rouse that the Rouse account was never authorized. Further, as Rouse points out, no one suggests that the four merchants acted in concert against Surety. The two actions thus have only factual overlap, not factual identity, which is an important, but less weighty, consideration for transfer.

As a practical matter, once Davis and the other Surety personnel have testified about the inner workings of their savings and loan, a consolidated action would rapidly become virtually two separate trials. Questions such as what Pentecoste knew and how closely he and Reynolds worked together, which bear heavily on the outcome of this suit, have little or no relevance to Surety's claims against the other three merchants. Conversely, the minutiae of Surety's trading with the other three merchants have little or no relevance to this suit. Despite the obvious advantages of transfer for judicial administration and for

Surety, it is not necessarily in the interests of justice to force Rouse, the party who originally brought this action, to sit through what could well be the equivalent of an additional trial to get its claim heard.

The other points Surety raises in support of litigation in North Carolina also can be counterbalanced to some extent by other factors. The tapes and transcripts of tapes are important and valuable, and doubtless a North Carolina venue would make access to them both easier and quicker. However, the tapes are the property of Rouse, and the U.S. Attorney has agreed in principle to return them at some future date. Should he prove recalcitrant, the court in North Carolina can resolve any conflict. There are, at least, more mechanisms for and a greater likelihood of getting the tapes to Chicago than for getting Pentecoste to Asheville. *Cf. Polychrome*, 259 F.Supp. at 334. There are documents in North Carolina which are needed for evidence, but similarly there are documents in Chicago, perhaps more since Rouse's trading records are here.

Relative docket congestion between the two venues deserves some consideration in a transfer motion. North Carolina is apparently somewhat less congested, with a somewhat shorter average period from filing to trial. However, docket congestion is usually not a factor of major importance, *see Kisko*, 408 F.Supp. at 987, and statistical averages are predictive only to the extent that the case at bar is an average case, *Mechanical Systems, Inc. v. Cadre Corp.*, 567 F.Supp. 948, 952 n. 2 (N.D.Ill.1983). Surety has in any event not shown a difference of such magnitude that it is likely to compensate for the fact that this suit has long been underway while the other action was filed less than six months ago. In fact, the filing in North Carolina was so late that many of Surety's claims could be barred by the two-year statute of limitations in the Commodities Exchange Act. Surety seems confident that its lack of actual knowledge will equitably toll the limitation period, but on these facts a court could conceivably find that Surety should have known earlier of the actual status of its trading. No claim in the instant case faces a limitation problem. In short, the existence of the pending action and the current location of the tapes are factors favoring a North Carolina venue, but neither offers an overwhelmingly strong basis for decision, and there are factors which tilt the other way.

## IV. Overall Evaluation

■ There are a number of good reasons to litigate these claims in North Carolina. Unfortunately for Surety, there are also good reasons to leave the suit here. There is no truly convenient venue for this case. Inconvenience to the parties seems roughly equal. Proceeding here is a hardship to Surety, but absorption into a larger and longer litigation in Asheville or Charlotte would be a hardship to Rouse. Considerations of what witnesses should testify significantly favor Chicago, and live witness testimony takes on considerable weight in fraud cases. The other factors considered in the interests of justice lean toward moving the suit, thanks to the pending action and the savings to judicial administration that consolidation of the two suits would bring. Overall, then, the scales are just about even. The principles of venue transfer law require that, given the weight assigned to a plaintiff's choice of forum, in case of a tie, plaintiff wins. *See, e.g.*, *Duman v. Crown Zellerbach Corp.*, 107 F.R.D. 761, 766 (N.D.Ill.1985). Surety has demonstrated a balance of factors which approximates a tie. That is not enough to justify a transfer.

## CONCLUSION

Defendant's motion to transfer venue to the Western District of North Carolina is denied.